# FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE **MAY 0 7 2015**

*Madsen, C.J.*
CHIEF JUSTICE



This opinion was filed for record
at __8:00 AM__ on __May 7 2015__.

*Susan L. Carlson, Deputy*
for Ronald R. Carpenter
Supreme Court Clerk

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 90039-6 |
| Respondent, | ) ) | (consolidated with No. 90270-4) |
| v. | ) ) | |
| MARISA MAY FUENTES, | ) ) | |
| Petitioner. | ) ) | En Banc |
| STATE OF WASHINGTON, | ) ) | |
| Respondent, | ) ) | |
| v. | ) ) | |
| STEVEN PAUL SANDOZ, | ) ) | Filed: **MAY 0 7 2015** |
| Petitioner. | ) ) | |

MADSEN, C.J.—These consolidated cases require the court to resolve whether the totality of circumstances in each case provided law enforcement with reasonable suspicion of criminal activity to conduct a *Terry* stop.[1] Both cases involve the stop of a defendant after the defendant entered a high-crime apartment complex and visited an

---

[1] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

apartment occupied by a suspected drug dealer. However, other circumstances distinguish the cases and lead to different results. Because the circumstances include a particularized suspicion of criminal activity in *State v. Fuentes*, noted at 179 Wn. App. 1030, 2014 WL 546587, at *4, we affirm the court of appeals in that case, but we reverse the appellate court in *State v. Sandoz*, noted at 180 Wn. App. 1032, 2014 WL 1600596, at *4, because, in contrast to *Fuentes*, there are insufficient facts to give rise to individualized suspicion.

## FACTS

### State v. Sandoz

Around 11:30 p.m., Officer Chris Pryzgocki drove his patrol car past a six-unit apartment building in SeaTac. A high number of documented criminal incidents occurred in the area of this apartment building, including drug-related activity. Because of the high incidence of crime, the owner of the complex gave the King County Sherriff's Office signed, written permission to investigate people who loiter on the property. The officer testified, however, that a person did not commit a violation merely by visiting an apartment. The officer knew the apartment building and its tenants well because the building was deemed part of a "Problem Solver project,"[2] which resulted in the officer regularly patrolling the complex. Verbatim Report of Proceedings (VRP) (Jan. 3, 2013) at 14–15. The officer patrolled the complex for four months, and consequently, he knew the tenants and knew the vehicles that they owned. He also knew that four of the tenants

---

[2] After an area receives this designation, law enforcement then focuses on that area, attempting to reduce crime.

had convictions for drug-related crimes—either possession or possession with intent to distribute.

While on patrol, Officer Pryzgocki saw a white Jeep—a vehicle the officer knew did not belong to any of the tenants—parked illegally.[3] The driver of the Jeep slumped down, as if to hide from the officer's view, as the officer drove by. The officer parked his marked patrol car about 20 yards away and observed the Jeep for about 15 minutes.

Nobody left the vehicle, which contained three people, so the officer got out of his car and walked up to the driver. The officer asked the driver what he was doing there. The driver said he was there because his friend called him for a ride. The driver, however, did not explain why he slumped down as the officer drove by. The officer then waited on the passenger side of the vehicle. He observed Steven Sandoz leaving the apartment of Jennifer Meadows, who the officer knew had a conviction for possession of narcotics with intent to distribute. Over the course of four months, the officer had seen approximately 60 people coming and going from her apartment but observed none on the evening in question.

Sandoz walked with his head down and his hands in his pockets toward the Jeep. When he looked up and saw the officer, Sandoz's eyes got big as he entered the backseat of the Jeep. The officer asked Sandoz what was going on, and Sandoz replied that his friend gave him a ride to collect $20 from Ms. Meadows. Sandoz was visibly shaking,

---

[3] The officer described the spot as a "no parking, fire, handicapped area." VRP (Jan. 3, 2013) at 18.

and his face looked pale and thin. The officer, however, did not attribute Sandoz's appearance to drug use or to any specific cause.

The officer believed that Sandoz's story for being at the apartment contradicted the driver's story. He asked Sandoz if he would mind stepping out of the vehicle. The officer again asked Sandoz what was going on, and Sandoz said he was there to collect $20 from Ms. Meadows.[4] After more conversation, Sandoz admitted that he had a drug problem and said that he had a crack pipe in his pocket. Sandoz took out the pipe, and the officer arrested Sandoz for possession of drug paraphernalia. During a search incident to arrest, the officer felt something in Sandoz's groin area. The officer read Sandoz his *Miranda*[5] rights, and Sandoz admitted that he had two small envelopes of cocaine in his underwear.

The State charged Sandoz with possession of cocaine. At pretrial, Sandoz moved to suppress his statements and the cocaine. Sandoz argued that a seizure occurred when the officer asked Sandoz to get out of the Jeep and that reasonable suspicion of criminal activity did not support the seizure.

The trial court disagreed, concluding that specific and articulable facts supported the seizure: (1) the officer knew the area had extremely high drug activity based on 911 calls and drug dealing investigations, (2) the officer knew that the apartment Sandoz

---

[4] Although the officer testified that what Sandoz said outside the vehicle contradicted what he said while sitting in the Jeep, the officer's testimony did not reveal any contradiction. *Compare* VRP (Jan. 3, 2013) at 23, *with* VRP (Jan. 3, 2013) at 21. The State claims that the officer's incident report, which the trial court did not admit into evidence, reveals different statements. Because the incident report was marked but not admitted into evidence, we do not consider it.

[5] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

4

exited belonged to Ms. Meadows, who had numerous drug-related convictions, including possession with intent to deliver, (3) the officer had express authority from the complex owner to trespass nonoccupants for "loitering" at the complex, (4) the Jeep did not belong to any of the tenants at the complex, (5) the driver of the Jeep slouched down when the officer drove past, (6) the driver and Sandoz had conflicting stories for why they were in the area, (7) Sandoz looked surprised when he saw the officer, and (8) Sandoz visibly shook and looked pale when the officer talked to him. Clerk's Papers at 53. On these facts, the trial court denied Sandoz's motion to suppress.

After a bench trial on stipulated facts, the trial court found him guilty of cocaine possession. In an unpublished opinion, the court of appeals affirmed. *Sandoz*, 2014 WL 1600596, at *4. Sandoz petitioned this court for discretionary review, which we granted. *State v. Sandoz*, 180 Wn.2d 1028, 331 P.3d 1173 (2014).

*State v. Fuentes*

On October 5, 2011,[6] Officer Roman Trujillo and Officer Shirrell Veitenheimer of the Kennewick Police Department went to a Kennewick apartment as part of an apprehension team to look for a wanted person. The apartment belonged to Richard Fenton. In November 2010, 11 months before, police made controlled purchases of methamphetamine from Fenton. Police subsequently executed a search warrant on the apartment, where they found methamphetamine and related materials. Police suspected

---

[6] The officers first visited the apartment after midnight on October 5, 2011, and returned around 10 p.m. later that night.

that Fenton was still selling narcotics based on recent interviews with individuals arrested for narcotics-related offenses.

Approaching Fenton's apartment, officers saw two people on the steps who turned and went into the apartment when they saw the police. Police knocked on the door, but nobody answered, so the police left and returned that evening around 10 p.m. to set up surveillance on the apartment.

During two hours of surveillance, police observed approximately 10 people enter and leave the apartment, each person staying inside between 5 and 20 minutes. Officer Trujillo testified that this behavior indicated narcotics activity: people arrive, make a purchase, and leave. VRP (Feb. 29, 2012) at 9. This observed behavior especially indicated narcotics activity because of the recent search warrant that uncovered narcotics at this apartment and because of the late hour of the short visits on a weeknight. *See id.* at 9-10, 30-31, 44-46.

Around midnight, police saw Marisa Fuentes park her car across the street from the apartment. She walked up to the apartment, entered, stayed for about five minutes, and returned to her car. She opened the trunk of her car and removed a small plastic bag. The bag contained something about the size of a small football. Then Fuentes reentered the apartment, stayed for about five minutes, and returned to her car with a bag that had noticeably less content than when she entered the apartment.

Based on what officers observed, police stopped Fuentes' car on suspicion of narcotics activity. An officer advised Fuentes that he needed to talk with her. For safety

reasons, the officer requested that Fuentes come to the police vehicle, which she did. The officer read Fuentes her *Miranda* rights. Fuentes waived those rights and admitted that she had just delivered marijuana to Fenton's apartment.

The State charged Fuentes with delivery of marijuana. Fuentes moved to suppress evidence uncovered from the investigative stop of her car, including her statement about delivering marijuana, arguing that the police lacked reasonable suspicion to justify the *Terry* stop of her vehicle. The trial court concluded that officers had reasonable suspicion to stop the vehicle and therefore denied the motion to suppress. Fuentes was subsequently convicted of delivery of marijuana at a stipulated facts trial. She appealed. In an unpublished opinion, the court of appeals affirmed. *Fuentes*, 2014 WL 546587, at *4. We granted Fuentes' petition for discretionary review. *State v. Fuentes*, 180 Wn.2d 1027, 328 P.3d 904 (2014).

## ANALYSIS

In reviewing the denial of a motion to suppress, we review the trial court's conclusions of law de novo and its findings of fact used to support those conclusions for substantial evidence. *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009).

Generally, under the Fourth Amendment to the United States Constitution and article I, section 7 of Washington's constitution, an officer may not seize[7] a person without a warrant. *State v. Garvin*, 166 Wn.2d 242, 248, 207 P.3d 1266 (2009). But a

---

[7]Under article I, section 7 of the Washington Constitution, a person is "seized" when an officer restrains—physically or by a show of authority—that person's freedom of movement to such an extent that a reasonable person would not feel free to leave or to decline the officer's request and terminate the encounter. *State v. O'Neill*, 148 Wn.2d 564, 574, 62 P.3d 489 (2003).

few carefully drawn exceptions exist. *Id.* We have recognized the *Terry* investigative stop as one of the exceptions. *See State v. Day*, 161 Wn.2d 889, 895, 168 P.3d 1265 (2007). Under this exception, an officer may, without a warrant, briefly detain a person for questioning if the officer has reasonable suspicion that the person stopped is or is about to be engaged in criminal activity. *Id.* Additionally, an officer may conduct a brief frisk for weapons, but only if a reasonable safety concern exists to justify the protective frisk. *Id.*

A valid *Terry* stop requires that the officer have reasonable suspicion of criminal activity based on specific and articulable facts known to the officer at the inception of the stop. *See State v. Gatewood*, 163 Wn.2d 534, 539-40, 182 P.3d 426 (2008); *State v. Glover*, 116 Wn.2d 509, 513-14, 806 P.2d 1068 (1992). In evaluating the reasonableness of the officer's suspicion, the reviewing court looks at the totality of the circumstances known to the officer. *Glover*, 116 Wn.2d at 514. The totality of circumstances includes the officer's training and experience, the location of the stop, the conduct of the person detained, the purpose of the stop, and the amount of physical intrusion on the suspect's liberty. *State v. Acrey*, 148 Wn.2d 738, 746-47, 64 P.3d 594 (2003).

We must determine if the officers had reasonable suspicion of criminal activity under the totality of circumstances to support the stops of Sandoz and Fuentes. If the officers did not, the evidence uncovered from the stops must be suppressed. *See State v. Doughty*, 170 Wn.2d 57, 65, 239 P.3d 573 (2010).

Reasonable suspicion did not justify a _Terry_ investigative stop of Sandoz

Under the totality of the circumstances, we hold that the officer did not have reasonable suspicion of criminal activity individualized to Sandoz to justify his _Terry_ stop. _See State v. Thompson_, 93 Wn.2d 838, 841, 613 P.2d 525 (1980) (holding that suspicion must be individualized).

The police relied on five facts to justify the _Terry_ stop involving Sandoz: (1) Sandoz's surprise when he saw the officer, (2) the "conflicting" stories between Sandoz and the driver, (3) Sandoz's pale appearance and shaking, (4) the officer did not recognize the Jeep, and (5) the officer had authority to admonish nonoccupants for "loitering" under a trespass agreement.

While we evaluate the totality of the circumstances to determine whether a reasonable suspicion of criminal activity exists, we do so, in part, by examining each fact identified by the officer as contributing to that suspicion.

As to the fact of surprise, this encounter was late at night: Sandoz was walking with his head down, and he registered surprise when he looked up to see the officer standing by the Jeep he was about to enter. Sandoz's surprise at seeing the officer did not suggest criminal behavior. _See State v. Gatewood_, 163 Wn.2d 534, 540, 182 P.3d 426 (2008) ("Startled reactions to seeing the police do not amount to reasonable suspicion.").

Next, the driver's story did not conflict with Sandoz's story. The driver said that his friend called him for a ride, and Sandoz said his friend gave him a ride to the apartment to collect $20. Rather than conflict, the stories confirmed one another.

As to his physical appearance, the officer did not attribute Sandoz's pallor or shaking to drugs or to any illicit conduct. Thus, this fact does not add to circumstances that suggest criminal activity.

The fact that the officer did not recognize the Jeep might justify the officer's contact with the driver, but the officer did not connect this fact with anything the officer observed about Sandoz.

Finally, the officer also considered the trespass agreement that allowed him to investigate people who "loiter"; he also believed he had reasonable suspicion to detain Sandoz for drug-related loitering under SeaTac Municipal Code (STMC) 8.05.380(C). The word "loiter" is undefined in the statute. *See* STMC 8.05.380; RCW 69.50.101. When a statute does not define a term, the court may consider the plain and ordinary meaning of the term in a standard dictionary. *State v. Bahl*, 164 Wn.2d 739, 754, 193 P.3d 678 (2008). Sandoz did not loiter.[8] "Loiter" means "to remain in or near a place in an idle or apparently idle manner." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1331 (2002). Sandoz did not remain idle: he left the apartment and walked immediately to the Jeep without stopping. Although the individuals in the Jeep may have loitered, that issue is not before the court. Similarly, Sandoz did not appear to trespass: he entered a tenant's apartment, stayed inside at least 15 minutes without any known discord, and left directly to the Jeep. The facts suggest that Sandoz was an invited guest

---

[8] This analysis also applies to the argument that the officer suspected Sandoz of drug-related loitering under STMC 8.05.380(c). If Sandoz did not "loiter," the statute does not apply.

of Ms. Meadows, and as the officer stated, simply going into an apartment does not equal wrongdoing.

In analyzing the circumstances that supported reasonable suspicion, the trial court also considered the fact that the driver of the Jeep slumped down as the officer drove by. Again, this behavior understandably raised concerns in the officer's mind about the driver and, because the vehicle was parked illegally, justified the officer's inquiry of the driver. However, nothing in the behavior that the officer observed—the driver's activity— connected with anything the officer subsequently observed about Sandoz to suggest that Sandoz engaged in criminal activity.

The trial court also cited the fact that Sandoz was visiting the apartment of a suspected drug dealer late at night in a high-crime area. However, without more, this fact does not justify a *Terry* stop. *See Doughty*, 170 Wn.2d at 62-63, 60 (holding police may not seize a person who visits a suspected drug house late at night and who stays for only two minutes based only on neighbor's complaints of short-stay traffic and where there is no "actual evidence of drugs, controlled buys, reports of known drug users or dealers frequenting the house, and so forth"). Other facts must exist to suggest criminal behavior. *See id.*

In this case, the officer merely acted on a hunch when he stopped Sandoz. The officer admitted that he did not have facts to believe Sandoz engaged in drug activity; he just felt "the entire circumstance was suspicious." VRP (Jan. 3, 2013) at 40. But an officer's suspicion must be of criminal activity and it must be reasonable. *Doughty*, 170

Wn.2d at 63. An officer's hunch does not justify a stop. *Id.* The totality of the circumstances in this case do not justify a *Terry* stop.

Reasonable suspicion existed to stop Fuentes' car

In contrast to Sandoz, when evaluating the totality of the circumstances leading to the *Terry* stop of Fuentes' car, we hold that the police had reasonable suspicion of criminal activity particularized to Fuentes before the stop occurred. *See Glover*, 116 Wn.2d at 514.

We agree with the Court of Appeals that *State v. Kennedy*, 107 Wn.2d 1, 726 P.2d 445 (1986), provides an apt analogy. Early in the morning, the officer in *Kennedy* went to investigate neighbor complaints about short-stay foot traffic going in and out of the "Smith house." *Id.* at 3. The officer had information from a reliable informant that Smith used this house to sell drugs. *Id.* The officer saw Kennedy leave the house and get into a maroon car, but the officer did not see anything in Kennedy's hands or see other suspicious activity. *Id.* at 3, 8. Nevertheless, the officer stopped Kennedy on suspicion of purchasing marijuana. *Id.* Although the informant told the officer that Kennedy bought marijuana from Smith in the past, only went to Smith's house to buy drugs, and drove a maroon car, the officer had no specific information that Kennedy bought drugs or intended to buy drugs that particular morning. Nevertheless, we held that reasonable suspicion supported the stop based on the present information about possible ongoing drug activity that morning—the short visits—and information about past drug transactions at Smith's house. *See id.* at 8-9.

12

The facts in this case closely parallel those in *Kennedy*. The officers in this case knew about past drug activity at Fenton's apartment. Police made controlled buys from Fenton and conducted a search of the apartment 11 months before and found drugs. The officers also testified they had recent information from individuals arrested on drug-related charges that Fenton was still dealing drugs. Additionally, officers observed short-stay foot traffic that morning (10 visits between 10 p.m. and midnight) that suggested ongoing drug transactions, like the neighbor complaints suggested in *Kennedy*.

But this case presents a more compelling circumstance than the facts present in *Kennedy*. While the officer in *Kennedy* had information that Kennedy had previously purchased drugs at Smith's house, nothing suggested that Kennedy purchased drugs on the morning of the stop—except for complaints about ongoing short-stay traffic. Here, in addition to short-stay traffic, officers could reasonably infer that Fuentes participated in the ongoing drug transactions: Fuentes entered the apartment briefly, then returned to her car. She then carried a plastic bag into the apartment, and she left with a bag that had noticeably less content. Her stay lasted approximately five minutes. From these observations, officers could form a reasonable suspicion that Fuentes made a delivery at the apartment. Given the context of her short-stay visit to an apartment with known drug use—after officers observed short-stay traffic consistent with drug transactions—and her delivery, officers could reasonably suspect that Fuentes delivered drugs. Although the bag may have contained innocent content, officers do not need to rule out all possibilities of innocent behavior before they make a stop. *Id.* at 6.

13

Fuentes relies on *Richardson* and argues that a person's mere proximity to another independently suspected of criminal activity—in this case, Fenton—does not justify a stop. *See State v. Richardson*, 64 Wn. App. 693, 697, 825 P.2d 754 (1992) (defendant was walking in a high-crime area near someone the officer suspected of drug dealing). But officers observed more than Fuentes' mere proximity to Fenton. They observed her make a short-stay visit to Fenton's apartment, carry a bag into his apartment, and leave with the bag altered in its shape.

Fuentes also compares her circumstances to *Doughty*, where we held an officer lacked reasonable suspicion to stop the defendant's car after the defendant merely visited a "suspected" drug house. 170 Wn.2d at 60. In that case, an officer saw the defendant park his car outside a suspected drug house at 3:20 a.m. *Id.* The defendant approached the house, returned to his car two minutes later, and drove away. *Id.* The officer did not see any of the defendant's actions at the house, including whether he entered the house. *Id.* Based on what the officer observed—the defendant's short-stay at a "suspected" drug house early in the morning—the officer stopped the defendant's car on suspicion of drug activity. *Id.*

Three facts differentiate this case from *Doughty* and lead to a different result.

First, we noted that police labeled the house in *Doughty* as a "drug house" based only on neighbor complaints about large numbers of short-stay traffic. *Id.* at 60. The police had nothing concrete, such as actual evidence of drugs, controlled buys, or reports of known drug dealers or users visiting the apartment. *Id.* Here, police had considerable

14

evidence that Fenton used his apartment for drug-related activity. Officers made controlled buys from Fenton, who still lived in the apartment, and conducted a search of the apartment 11 months before and found drugs. Additionally, police also had information suggesting Fenton was still dealing drugs.

Second, the officer in *Doughty* did not observe the defendant carry any unusual objects or have any idea about what, if anything, the defendant did at the house. *Id.* at 64-65. Here, officers saw Fuentes carry a plastic bag. And they had a well-founded idea of what Fuentes did at the apartment based on the alteration in the bag: she made a delivery.

Third, the officer in *Doughty* did not observe any short-stay traffic at the house that evening other than the defendant's two-minute stay. *Id.* at 60. Here, police observed approximately 10 people enter and leave the apartment over a period of two hours. This activity suggested ongoing drug transactions, and Fuentes' delivery reasonably appeared part of that illicit stream of commerce. Based on the totality of the circumstances, we hold that the officers had reasonable suspicion of criminal activity to justify the *Terry* stop of the Fuentes vehicle.

## CONCLUSION

We affirm the Court of Appeals in *Fuentes* because, under the totality of circumstances, the officers had individualized reasonable suspicion of criminal activity. In contrast, the officer did not have reasonable suspicion that Sandoz engaged in criminal activity. Therefore, we reverse the Court of Appeals in *Sandoz*.

15

_Madsen, C.J._

WE CONCUR:

_Wiggins, J._

_Owens, J._

_Fairhurst, J._

_Stephens, J._

No. 90039-6

GONZÁLEZ, J. (concurring in part and dissenting in part)—Officers of the law stopped and searched both Steven Sandoz and Marisa Fuentes, without warrants, largely because each of them had been seen at a building that was under police surveillance. Sandoz was seized near the building; Fuentes was followed by police and seized as she pulled into the driveway of a home. The State contends that both seizures were lawful under *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), which empowers officers to make brief, warrantless searches and seizures under limited circumstances. Since officers seized and searched both Sandoz and Fuentes without warrants, the State bears the burden of showing the seizures were justified. I concur with the majority that the State has not met this burden as to Sandoz. But the State has also failed to show sufficient lawful grounds to seize Fuentes. To the extent the majority finds otherwise, I respectfully dissent.

Our constitution protects us from being disturbed in our private affairs without authority of law. WASH. CONST. art. I, § 7. If officers of the State violate this constitutional precept, the fruits of that violation are inadmissible in

1

court. *State v. Doughty*, 170 Wn.2d 57, 65, 239 P.3d 573 (2010) (citing *State v. Garvin*, 166 Wn.2d 242, 254, 207 P.3d 1266 (2009)).

The State does not have authority of law to seize people merely because they know someone or go somewhere associated with criminal activity. We do not indulge in guilt by association in our state, and a person does not become a criminal simply by being with people or in places that are or are perceived to be associated with criminal activity. *See id.* at 62 ("A person's presence in a high-crime area at a 'late hour' does not, by itself, give rise to a reasonable suspicion to detain that person." (citing *State v. Ellwood*, 52 Wn. App. 70, 74, 757 P.2d 547 (1988))); *State v. Thompson*, 93 Wn.2d 838, 841, 613 P.2d 525 (1980) (finding that "mere proximity to others independently suspected of criminal activity does not justify the stop" (citing *Ybarra v. Illinois*, 444 U.S. 85, 100 S. Ct. 338, 62 L. Ed. 2d 238 (1979))). I respectfully disagree with the majority that it is appropriate to put so much weight on the fact Fuentes visited "a high-crime apartment complex." Majority at 1. Under article I, section 7 of our state constitution, searches must be based on individualized suspicion. *In re Pers. Restraint of Nichols*, 171 Wn.2d 370, 377-78, 256 P.3d 1131 (2011) (citing *City of Seattle v. Mesiani*, 110 Wn.2d 454, 755 P.2d 775 (1988); *York v. Wahkiakum Sch. Dist. No. 200*, 163 Wn.2d 297, 178 P.3d 995 (2008)). As it is not a crime to be with people suspected of criminal activities or in places that may have crime, such facts alone cannot justify a *Terry* stop, and those living in or traveling through such places do not have a reduced expectation of privacy. *Doughty*, 170 Wn.2d at 62 (citing *Ellwood*, 52 Wn. App. at 74; *Thompson*, 93 Wn.2d at 841).

Instead, *Terry* stops must be reasonable and based on "'specific and articulable facts'" that are individualized to the person the police seek to stop. *Id.* at 62 (quoting *Terry*, 392 U.S. at 21), 63. The trial court made 32 findings of fact relating to the officers' search and seizure of Fuentes. Twenty of those findings were entirely neutral, most having to do with things that happened after Fuentes was seized. Eleven of the findings concerned either Richard Fenton, the primary subject of their surveillance, or his apartment. Only one of the findings was individualized to potentially suspicious conduct by Fuentes. The trial court found that she

> approached the apartment in an unusual manner: she climbed the stairs to the door, then went back to the car and retrieved a bag from the trunk; then, went to the door again, remained for a short period of time and then exited again with a now empty or nearly-empty bag. She placed the bag in the trunk and departed.

Clerk's Papers at 78. Even taken in the context of the fact she was close to a house being observed (without a warrant and with the assistance of night vision goggles), this fact alone simply cannot justify a seizure.

The majority seems to suggest the fact that a "recent" search warrant had found narcotics in Fenton's apartment was relevant to whether police had reasonable suspicion of Fuentes. Majority at 6 (citing Verbatim Report of Proceedings (Jan. 3, 2013) at 9-10). The record suggests that warrant was issued in November 2010. Fuentes was arrested in October 2011, 11 months later. I respectfully disagree that this can be properly characterized as "recent."

But even if Fuentes's visit to an apartment building while carrying a grocery bag alone could justify the stop, I find it remarkable that officers did

not seize Fuentes either at that time or right after she left the immediate area. Instead, she was followed by different officers than the ones who observed her at Fenton's home (who seem to have lost sight of her for some time) and stopped as she was about to pull into the driveway of a home where her boyfriend, among others, was in the front yard. Nothing in the record suggests anything happened that would warrant police attention from the time she drove away from the first home until she pulled into the driveway at the second, and the judge noted specifically that she was not stopped for a traffic infraction.

I respectfully disagree with the majority that the facts in this case are analogous to those in *State v. Kennedy*, 107 Wn.2d 1, 726 P.2d 445 (1986). In *Kennedy*, a police officer was investigating complaints from neighbors regarding high levels of traffic at Rob Smith's home. *Id.* at 3. Additionally, that officer had received a tip from a reliable informant "that Michael Kennedy regularly purchased marijuana from Smith, that Kennedy only went to Smith's house to buy drugs, and that Kennedy usually drove either a light green pickup truck or a maroon Oldsmobile." *Id.* at 3. That officer was driving by Smith's house when he saw a maroon Oldsmobile parked nearby. He stopped, saw Kennedy leave the house, get into the Oldsmobile, and drive away. *Id.* The officer pulled Kennedy over, saw him "lean forward as if to put something under the seat," and asked him to step out of the car. *Id.* The officer found marijuana under the seat. *Id.* at 4. We found the officer had "sufficient articulable suspicion to stop Kennedy as he drove away from the Smith house." *Id.* at 8.

In contrast, nothing in the record before us suggests the officers had an informant's tip that Fuentes was buying or selling drugs herself at Fenton's home or that she went to Fenton's home only for such purposes. Nor, unlike Kennedy, did she appear to secrete anything in the car when stopped. *Kennedy* is not an apt analogy. Instead, this case is much more like *Doughty*. Doughty, like Fuentes, made a brief stop late at night at a house that was under surveillance. 170 Wn.2d at 60. Shortly after and by the same officer who had observed him at the house, he was stopped, searched, found to be in possession of drugs, and arrested. *Id.* We found that the State had failed to show "sufficient specific and articulable facts" to justify the seizure and suppressed the fruits of the search. *Id.* at 65.

The majority makes much of the fact that Doughty was not seen to have anything in his hands, while Fuentes did. I do not find this fact persuasive. First, we noted in *Doughty* that the most persuasive element in *Kennedy* was the reliable informant's tip, not the fact the defendant's hands were empty. *Id.* at 64 (citing *Kennedy*, 107 Wn.2d at 6-8). Second, people often carry small things in their hands, from phones to footballs. This is, at best, only weakly suggestive of criminal behavior.

People in our state do not lose their legitimate expectation of privacy merely because they are seen near people or places suspected of criminal activities. I find the State has not met its burden of establishing officers had specific and articulable facts, individualized to the defendants, that gave rise to a reasonable suspicion in either case. To the extent the majority finds that it has, I respectfully dissent.

5

_____

González, J.