# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 51284-0-II |
| Respondent, | |
| v. | |
| MICHAEL WAYNE HICKMAN, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, J. — Michael Wayne Hickman appeals from his jury trial conviction for first degree trafficking in stolen property. We hold that (1) there was sufficient individualized suspicion to justify the investigatory stop that led to Hickman's arrest, (2) Hickman was not entitled to a unanimity instruction requiring the jury to determine which of two people owned the stolen property, (3) the trial court lacked the authority to order forfeiture of property, and (4) under *State v. Ramirez*, 191 Wn.2d 732, 426 P.3d 714 (2018), Hickman is entitled to reexamination of his legal financial obligations (LFOs). Accordingly, we affirm Hickman's conviction but remand for the trial court to strike the forfeiture order in the judgment and sentence and to reexamine the LFOs under the current law.

## FACTS

### I. BACKGROUND

On May 21, 2012, at approximately 5:00 AM, Beverly McQueary called 911 to report hearing the sound of someone cutting trees with a chain saw on her property. Kitsap County

Sheriff's Office (KCSO) Deputy Alan Langguth responded to the call, but he did not notice anything unusual when he arrived.

Later that same day, KCSO Deputy Lee Watson explored the McQuearys' property with Gregory McQueary. Watson and Gregory[1] discovered that some maple trees had been cut down and found tire tracks on Sterling Scott Delhaute's neighboring property that led from a gate on Apex Road to the area where the cut maples were found.

Around 2:00 AM the following morning, Beverly contacted the sheriff's office and reported again hearing chainsaws on the McQuearys' property. Beverly spoke to Deputy Langguth and relayed what Deputy Watson had discovered the previous day. She also told Langguth that the entrance to the property was likely at the gate on Apex Road.

About a half an hour later, Deputy Langguth arrived at the gate on Apex Road and parked below the gate, near the entrance to a housing development, to await backup. The deputy could hear the sound of someone cutting wood with an axe coming from the wooded area.

A short time later, a pickup truck approached the deputy on Apex Road from the direction the sounds had originated. The driver turned into Scott Yoder's nearby driveway. Deputy Langguth pulled in behind the truck with his emergency lights activated, and the driver stopped the truck. As Langguth approached the truck, he could see flowers on the truck that suggested the truck had been driven in a wooded or brushy area, and he noticed that the back of the truck contained cut wood.

---

[1] Because Beverly and Gregory McQueary share the same last name, we refer to them by their first names for clarity. We intend no disrespect.

Deputy Langguth spoke to the truck's occupants while they remained in the truck. Hickman was driving the truck; Yoder was the passenger. In response to Langguth's questioning, Yoder said that they had cut down two trees early the previous morning and that they had returned that night to retrieve the wood. Yoder stated that the property on which he was cutting the trees belonged to his boss, Delhaute. Hickman said that he had just been helping Yoder. After asking them a few questions, Langguth allowed Yoder and Hickman to leave.

Later that day, after learning of Deputy Langguth's contact with Hickman and Yoder, Deputy Watson contacted Delhaute. After talking to Delhaute, Watson contacted Yoder. When the deputy arrived at Yoder's, he saw "maple woodblocks" that "appear[ed] to have been processed for sale" in a shed on Yoder's property. 2 Verbatim Report of Proceedings (VRP) at 205. Watson arrested Yoder.

Deputy Watson, then drove to Hickman's home. Hickman admitted that he had helped Yoder cut up the maple wood, but he asserted that the wood was from Delhaute's property. Hickman also said that he was selling the wood for Yoder.

## II. PROCEDURE

### A. CHARGES AND SUPPRESSION MOTION

The State charged Hickman with first degree trafficking in stolen property. Hickman moved to suppress the evidence obtained following the stop of the truck, arguing that the initial warrantless stop of the truck was not supported by reasonable suspicion or probable cause.

Based on the facts set out above,[2] the trial court denied the motion to suppress and entered the following written conclusions of law:

II.

That on May 22nd, 2012 Deputy Langguth was aware that at 5:00 AM on May 21st, 2012 and again at 2:00 AM, May 22nd, 2012, someone had been using a chainsaw to cut maple trees on the property of the McQueary[s] without permission. The deputy was also aware, through the investigation of Deputy Watson that the person's [sic] doing the cutting were likely using a vehicle, and that they were obtaining access to the McQueary property by means of a gate and road off of Apex Road.

III.

That at about 2:30 AM, May 22nd, 2012 Deputy Langguth again responded to Apex Road and he could hear the sounds of an axe being used in the woods. He was also aware that there were a limited number of homes in the area. At 2:30 AM, the only vehicle he saw was the defendant's vehicle, coming down Apex Road from the direction of the gate on Apex which the tree cutters were likely using. It is not likely that in the dark the deputy was able to see any sawdust, or flowers, on the truck before he stopped the truck. The flowers on the truck that the deputy saw immediately after the stop were consistent with the truck having very recently been in a brushy area. The cut wood in the back of the truck was also consistent with someone having been in the woods cutting wood.

IV.

That Deputy Langguth had a reasonable suspicion that on May 21st and May 22nd, 2012 someone was accessing the gate and the road off Apex Road to enter onto property belonging to the McQueary[s] to cut and steal their maple trees. Deputy Langguth had a reasonable suspicion based on articulable facts, that the truck he saw coming down Apex Road from the direction of the suspect gate and the illegal cutting, on a road lightly used, and on that morning not being used by any other vehicle at that time, might be connected with the wood cutting. The coincidence of the time, location and very recent tree cutting made it reasonable and appropriate for the deputy to engage the truck, and the defendant, in a brief stop to make inquiries concerning his suspicions. The flowers on the truck that the deputy saw immediately after the stop were consistent with the truck having very recently been in a brushy area. The cut wood in the back of the truck was also consistent with someone having been in the woods cutting wood. The stop was in fact very brief and involved minimal interference in the activities of the defendant on May 22nd, 2012.

V.

---

[2] Hickman does not challenge the trial court's findings of fact. Accordingly, they are verities on appeal. *State v. Broadaway*, 133 Wn.2d 118, 131, 942 P.2d 363 (1997).

That the motion of the defendant to suppress evidence obtained through the stop under CrR 3.6 is denied.

Clerk's Papers (CP) at 143-44.

### B. TRIAL AND SENTENCING

At trial, there was testimony that the cut trees were on either the McQuearys' property or Delhaute's property. Gregory and Delhaute both testified that no one had permission to cut any standing trees on their respective properties.

Neither party requested, and the trial court did not provide, a unanimity instruction requiring the jury to determine whether the stolen property belonged to the McQuearys or to Delhaute. In closing argument, the State argued that regardless of whether the trees were on the McQuearys' or Delhaute's property, Hickman had no authority to cut the trees. In its rebuttal argument, the State argued, "The issue is not whether the stolen property came from a particular victim or not. The issue is was the property stolen." 2 VRP at 310.

The jury found Hickman guilty of first degree trafficking in stolen property.

At the sentencing hearing, the trial court did not discuss LFOs or any forfeiture. But in the judgment and sentence, the trial court imposed a $200 filing fee and a $100 deoxyribonucleic acid (DNA)/biological sample fee. Additionally, without citation to any statutory authority, the trial court ordered Hickman to forfeit "all seized property referenced in the discovery."[3] CP at 194.

Hickman appeals his conviction, the forfeiture order, the $200 criminal filing fee, and the $100 DNA fee. The trial court found him indigent for purposes of appeal.

---

[3] The record does not show what, if any, property had been seized.

ANALYSIS

I. VALID INVESTIGATORY STOP

Hickman first argues that the trial court erred when it denied his suppression motion. Challenging conclusions of law III and IV, he argues that there was insufficient individualized suspicion to justify the initial investigatory stop. We disagree.

A. LEGAL PRINCIPLES

When reviewing the denial of a motion to suppress, we review the trial court's conclusions of law de novo and the findings of fact used to support those conclusions for substantial evidence. *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). Hickman does not challenge any findings of fact, thus they are verities on appeal.

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution provide that officers may not generally seize a person without a warrant. *Garvin*, 166 Wn.2d at 249. One exception to the warrant requirement is the *Terry*[4] investigative stop. *Garvin*, 166 Wn.2d at 249. Under this exception, an officer "may briefly stop and detain an individual for investigation without a warrant if the officer reasonably suspects the person is engaged or about to be engaged in criminal activity." *Garvin*, 166 Wn.2d at 250. We evaluate the reasonableness of the officer's suspicion by examining the totality of the circumstances known to the officer. *State v. Glover*, 116 Wn.2d 509, 514, 806 P.2d 760 (1991). Whether an officer had reasonable suspicion is an objective standard, and the officer's suspicion must be based on specific

---

[4] *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L. Ed. 2d 889 (1968).

and articulable facts known to the officer at the inception of the stop. *State v. Gatewood*, 163 Wn.2d 534, 539-40, 182 P.3d 426 (2008).

Additionally, the officer's reasonable suspicion must be individualized to the person being stopped. *State v. Thompson*, 93 Wn.2d 838, 841, 613 P.2d 525 (1980). The key question is "whether the specific facts that led to the stop would lead an objective person to form a reasonable suspicion that [the detainee] was engaged in criminal activity" based on "the facts known at the inception of the stop." *State v. Weyand*, 188 Wn.2d 804, 812, 399 P.3d 530 (2017). When the activity is consistent with criminal activity but also consistent with noncriminal activity, it may still justify a brief detention. *State v. Kennedy*, 107 Wn.2d 1, 6, 726 P.2d 445 (1986). "It is generally recognized that crime prevention and crime detection are legitimate purposes for investigative stops or detentions." *Kennedy*, 107 Wn.2d at 5-6 (citing *Terry*, 392 U.S. at 21).

## B. REASONABLE SUSPICION

Hickman argues that the trial court's conclusion that there was reasonable suspicion that he was engaged in criminal activity was incorrect because the evidence known to Deputy Langguth at the time of the stop established only a coincidental proximity to criminal activity, not individualized suspicion. We disagree.

### 1. SCOPE OF EVIDENCE

As a preliminary matter, we clarify what evidence we rely on when examining the trial court's reasonable suspicion finding. Hickman argues that the trial court erred by relying on facts discovered by Deputy Langguth immediately after the stop, specifically the flowers on the truck and the cut wood in the back of the truck. Hickman misreads the trial court's conclusion of law.

Although the trial court refers to the flowers and the cut wood in its conclusions of law, the trial court does not mention those facts until after it concludes that Deputy Langguth had reasonable suspicion justifying the initial stop. As such, the presence of the flowers and the discovery of the wood are relevant only to whether the continued detention was appropriate, not whether the initial stop was proper, and we do not consider these facts in our reasonable suspicion analysis.

2.     INDIVIDUALIZED SUSPICION

Hickman argues that the remaining facts are not sufficient to establish reasonable suspicion to conduct the initial investigatory stop because mere temporal and physical proximity to criminal activity do not demonstrate an individualized suspicion and the deputy did not observe Hickman or Yoder "doing anything inherently suspicious before they were seized." Br. of Appellant at 17. He asserts that the trial court did no more than associate Hickman to a place where criminal activity had occurred. We disagree.

Hickman argues that this case is like *State v. Doughty*, 170 Wn.2d 57, 239 P.3d 573 (2010). In *Doughty*, the defendant approached a suspected drug house in the early morning hours, stayed for two minutes, and then drove away. 170 Wn.2d at 60. Our Supreme Court held that a person's mere presence in a high crime area at that time of day was not sufficient to establish a reasonable suspicion that that person was engaged in illegal activity. *Doughty*, 170 Wn.2d at 62-63. Hickman asserts that this case is like *Doughty* because all the deputy knew at the inception of the stop was that the truck was present in a location where suspected criminal activity had occurred at an unusual time.

8

Here, unlike in *Doughty*, where the officer knew only that the place Doughty entered was a suspected drug house and did not apprehend any actual criminal activity in the area, there was more than a physical relationship to potential criminal activity. Deputy Langguth did not merely suspect evidence of a crime being committed close in time and place to when he observed the truck, he heard evidence of such a crime. Additionally, there was very little traffic, so there was a higher probability that the truck was related to the currently occurring, known illegal activity. Thus, *Doughty* is not instructive here.

Hickman further argues that to establish reasonable suspicion there needs to have been a more overt, individualized connection between the vehicle and the suspected criminal activity than in this case. He cites to *State v. Fuentes*, 183 Wn.2d 149, 352 P.3d 152 (2015), and *Kennedy* as examples of the kind of connection to criminal activity that must exist.

In *Fuentes*, the officers (1) observed a residence of a known drug dealer, (2) "knew about past drug activity" at the residence, (3) watched approximately 10 people enter the residence and stay for very short periods of time before leaving suggesting current, ongoing drug activity, and (4) saw the defendant enter the apartment, return to her car and retrieve a plastic bag containing something, return to the apartment, and then leave the apartment a short time later with the bag containing noticeably less than when the defendant entered the residence. 183 Wn.2d at 156-57, 162. Our Supreme Court held that these facts, including the change in the bag's contents, which tied the defendant to the ongoing drug activity in the house, were sufficient to establish a reasonable suspicion of criminal activity to justify the seizure. *Fuentes*, 183 Wn.2d at 162-63.

Hickman argues that because the deputy did not actually observe the truck leaving the wooded area, the individualized connection to criminal activity present in *Fuentes* is missing here.

Hickman is correct that the facts linking the truck and Hickman to the crime are more attenuated than the facts linking the defendant to the crime in *Fuentes*. But that alone does not mean that there was insufficient evidence of criminal activity to justify the stop here; we must examine the totality of the circumstances, not just one specific factor that may have supported reasonable suspicion.

In *Kennedy*, an officer was investigating complaints from a neighbor about short-stay foot traffic in and out of a neighbor, Rob Smith's, home. 107 Wn.2d at 3. The officer also knew from an informant that Kennedy purchased drugs from Smith, Kennedy only went to Smith's house to buy drugs, and the types of vehicles Kennedy drove. *Kennedy*, 107 Wn.2d at 3. The officer observed one of the vehicles Kennedy was known to drive and saw Kennedy go in and out of Smith's house and then leave. *Kennedy*, 107 Wn.2d at 3. Although the officer had not directly observed any crime and did not see anything in Kennedy's hands, the officer stopped Kennedy's vehicle to investigate whether Kennedy had purchased marijuana. *Kennedy*, 107 Wn.2d at 3. When Kennedy stopped, the officer observed Kennedy lean forward and place something under the front seat. *Kennedy*, 107 Wn.2d at 3. Our Supreme Court held that the officer had reasonable suspicion of criminal activity based on the information from the informant, the neighbor's complaint, the officer's experience with drug investigations, and his eyewitness corroboration of some of the information others had reported. *Kennedy*, 107 Wn.2d at 8-9.

Hickman argues that *Kennedy* is distinguishable because here Deputy Langguth did not know who he was stopping and did not see the truck enter or leave the woods where the illegal activity occurred. Although the officer in *Kennedy* had specific information about the person the officer detained, *Kennedy* does not require such specific information to justify every stop. Instead,

10

*Kennedy* emphasizes that we must examine the totality of the circumstances known to the officer at the time of the stop. 107 Wn.2d at 6. Although Deputy Langguth did not directly observe the criminal activity, he heard it. And although he did not have information about Hickman or Yoder, the deputy knew that the truck was coming from the area where the criminal activity was occurring at an unusual time and there were no other vehicles around. This was sufficient to justify a short investigatory stop of the truck.

The evidence supporting an individualized suspicion in this case falls closer to that in *Fuentes* and *Kennedy* than in *Doughty*. Unlike in *Doughty*, where there was merely the defendant's presence at a suspected drug house, there was, as there was in *Fuentes* and *Kennedy*, evidence of a crime actually being committed contemporaneous to the stop. And although there are numerous innocent reasons a vehicle may be travelling a road in the early morning hours, "officers do not need to rule out all possibilities of innocent behavior before they make a stop." *Fuentes*, 183 Wn.2d at 163.

We conclude that the facts that were present—the deputy's knowledge of recent criminal activity, the sound of chopping in the location of the known criminal activity, the proximity of the truck to the area where the criminal activity occurred close in time to when the deputy heard the chopping, and the lack of other vehicle traffic at the time—was sufficient to establish a reasonable suspicion that the truck was involved in the unlawful tree cutting. Accordingly, the trial court did not err when it concluded that the deputy had reasonable suspicion and denied the motion to suppress.

## II. No Unanimity Instruction Required

Hickman next argues that he was denied his right to a unanimous verdict because the trial court did not give the jury a unanimity instruction requiring the jury to decide who the theft victim was—the McQuearys or Delhaute. We disagree.[5]

The Washington Constitution gives criminal defendants the right to a unanimous jury verdict. CONST. art. I, § 21. In cases where the State presents evidence of multiple criminal acts and any one of these acts could constitute the crime charged, the jury must unanimously agree on the same act that constitutes the crime in order to convict the defendant. *State v. Petrich*, 101 Wn.2d 566, 572, 683 P.2d 173 (1984), *overruled in part on other grounds by State v. Kitchen*, 110 Wn.2d 403, 405-06, 756 P.2d 105 (1988). To ensure jury unanimity in "multiple acts" cases, either the State must elect the particular criminal act on which it will rely for conviction or the trial court must instruct the jurors that all of them must agree that the same underlying criminal act has been proved beyond a reasonable doubt. *Petrich*, 101 Wn.2d at 572.

Hickman argues that this is a multiple acts case because there were two theft victims, the McQuearys and Delhaute. But the victim of trafficking in stolen property is not the victim of the completed theft, it is the potential buyer of the stolen property. *State v. Walker*, 143 Wn. App. 880, 891, 181 P.3d 31 (2008) (intended victim of first degree trafficking in stolen property is the person to whom the defendant intended to sell the stolen property). So the fact there were potentially two theft victims does not establish that this is a multiple acts case.

---

[5] For purposes of this analysis, we presume, without deciding, that we may review this issue under RAP 2.5(a)(3).

12

Furthermore, the jury was not required to consider the identity of the owner of the stolen property. Here, the jury was instructed that to prove first degree trafficking in stolen property, the State had to prove that Hickman "knowingly trafficked in stolen property." CP at 164; RCW 9A.82.050. It was further instructed that "'[t]raffic' means to sell, transfer, distribute, dispense, or otherwise dispose of stolen property to another person, or to buy, receive, possess, or obtain control of stolen property, with intent to sell, transfer, distribute, dispense, or otherwise dispose of the property to another person." CP at 160. These instructions show that it is status of the property as stolen property that is relevant, not the source of the stolen property. Because the jury was not required to consider who owned the stolen property, the fact there were two potential theft victims was irrelevant and a unanimity instruction was not required.

## III.  FORFEITURE NOT AUTHORIZED

Hickman next argues that the trial court erred in ordering the forfeiture of "all seized property referenced in the discovery" without statutory authority. Br. of Appellant at 29. The State concedes error.

Because the trial court failed to refer to any statutory authority authorizing the forfeiture, and the State does not assert there was a statutory basis for the forfeiture, we accept the State's concession. *State v. Roberts*, 185 Wn. App. 94, 96, 339 P.3d 995 (2014) (reversing forfeiture provision because the State failed to provide statutory authority for the forfeiture and the

13

sentencing court did not provide any statutory authority for its forfeiture order).  Accordingly, we remand for the trial court to strike the forfeiture clause from Hickman's judgment and sentence.[6]

## IV.  LFOs

Finally, Hickman argues that under recent amendments to the LFO statutes that apply to him, the trial court cannot impose the $200 filing fee or the $100 DNA fee.  The State concedes that "discretionary costs must be stricken pursuant to [*Ramirez*]."  Br. of Resp't at 26.

In 2018, our legislature amended several statutes addressing LFOs.  LAWS OF 2018, ch. 269, § 17.  Our Supreme Court has held that these amendments apply prospectively and are applicable to cases, like this one, that are pending on direct review and not final when the amendment was enacted.  *Ramirez*, 191 Wn.2d at 747.  In light of these legislative changes, we remand for the trial court to review Hickman's LFOs under the current law.  On remand, the trial court must determine whether Hickman was indigent under RCW 10.101.010(3)(a) through (c) before imposing the $200 filing fee and whether Hickman had a DNA sample collected based on a prior conviction before imposing the $100 DNA fee.[7]  RCW 10.01.160(3); RCW 43.43.7541, *see State v. Catling*, 193 Wn.2d 252, 258, 438 P.3d 1174 (2019).

---

[6] The State argues that this is a scrivener's error and that we should remand for a ministerial correction of the judgment and sentence.  But a scrivener's error is a clerical error on a judgment and sentence that does not reflect the sentence the trial court intended and there is no evidence in the record suggesting that ordering the forfeiture was a clerical error rather than an error in the trial court's judgment.  Accordingly, remand for the trial court to strike the forfeiture provision, particularly in light of our need to remand for the trial court to redetermine whether to impose the LFOs, is the appropriate remedy.

[7] On remand, the trial court may also examine all of the LFOs and LFO-related provisions that were subject to the 2018 legislative amendments; it is not limited to reexamining only the criminal filing fee and the DNA collection fee.

No. 51284-0-II

Accordingly, we affirm the conviction, but we remand for the trial court to strike the forfeiture provision and to reexamine the imposition of Hickman's LFOs.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, J.

We concur:

WORSWICK, P.J.

GLASGOW, J.