IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 80560-6-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| S.-M., A., | ) | |
| DOB: 04/26/2001, | ) | |
| | ) | |
| Appellant. | ) | |

BOWMAN, J. — A.S.-M. appeals his conviction of juvenile in possession of a firearm. He argues that the trial court should have suppressed the evidence used against him as fruit from an unlawful seizure. Because his seizure was not supported by individualized, articulable, reasonable suspicion that A.S.-M. committed or was about to commit a crime, we reverse the trial court's denial of A.S.-M.'s motion to suppress the evidence and vacate his conviction.

FACTS

At 10:07 p.m. on April 1, 2019, Everett Police Department officers responded to a 911 call reporting a burglary in progress in building I of the Lakeside Apartments complex.[1] A resident reported that an "unknown male"

_____

[1] We note that the record also refers to the apartment complex as the "Waterstone" apartments.

Citations and pin cites are based on the Westlaw online version of the cited material.

kicked in her door and was in her apartment. Police arrived at the apartment complex at 10:11 p.m. At 10:12 p.m., the woman told the 911 operator that the unknown male "is gone" and "she is safe" in her apartment.

Shortly after they arrived, Officer Andrew Baker and Officer Josh Freeman noticed two males walking together between buildings C and D. One of the males saw the police and began running. Officer Freeman identified himself as a police officer and told the males to stop. The second male then ran as well. The second male was wearing a backpack and holding a steering wheel.[2] Officer Freeman again shouted, " 'Stop, police,' " and both officers gave chase. Both officers "noticed an odor of burnt marijuana" as they chased the males.

A third officer, Timothy Walker, arrived on scene and joined the pursuit. Officer Walker found the males between buildings D and E of the apartment complex and detained them. Officers were handcuffing the two males for obstruction when Officer Freeman and Officer Baker caught up to them. Officers identified the first male who fled as L.L. The second male with the backpack was A.S.-M.

Officer Freeman and Officer Baker contacted the person who reported the burglary at building I and learned no crime had occurred because "[s]he never saw anyone" in her apartment and there was no evidence of a burglary. While walking back to contact A.S.-M. and L.L., Officer Freeman and Officer Baker discovered a set of "shaved" keys, a phone, a lighter, and a bag with what appeared to be marijuana hidden under a nearby car. Another car near where

---

[2] During the chase, the male tripped, fell, and dropped the steering wheel.

the officers first saw the two males smelled of marijuana and made a "dinging" sound as if it had keys in the ignition. Finding no key in the ignition, the officers asked dispatch to contact the registered owner of the car and learned the owner reported it as stolen.

Officer Freeman and Officer Baker spoke to A.S.-M. and L.L. They asked the males questions about why they fled and asked A.S.-M. if they could search his backpack. A.S.-M. agreed to the search. Officer Freeman and Officer Baker found a "fully loaded" stolen firearm, shaved keys, a file "that can be used to manufacture shaved keys," and A.S.-M.'s wallet with his driver's license in the backpack. Officer Baker arrested A.S.-M. for possession of a stolen firearm, possession of vehicle theft tools, and obstructing a law enforcement officer. He read A.S.-M. his Miranda[3] rights with juvenile warnings.

The State charged A.S.-M. with one count of juvenile in possession of a firearm. A.S.-M. moved to suppress the evidence found in his backpack. The trial court held a CrR 3.6 hearing and considered testimony from Officer Baker, Officer Freeman, and Officer Walker. All three officers testified that they detained A.S.-M. only because he matched the description of the burglary suspect—an "unknown male"—and because he fled.

The trial court issued CrR 3.6 findings of fact and conclusions of law. It found that the officers arrived on scene about four minutes after 911 dispatched them to a "burglary in progress." As they approached the apartment, they saw two males. "The two males began running away when they saw the police

_____

[3] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

3

officers." Officer Freeman shouted, " 'Stop, police,' " and pursued the males. "Other officers" stopped the two males behind one of the apartment complex buildings. The court found the officers detained the males for "officer safety." A.S.-M. then consented to the search of his backpack, where the police located a loaded firearm, a file, and shaved keys. The trial court concluded:

1. Based on the time and location of the potential burglary being investigated, the proximity to the location were the two males were initially observed, and their flight in the presence of police, it was reasonable for the officers to contact the two males to determine whether they were involved in the reported burglary or if they saw anyone in the area.

2. Based on his flight from the officers and refusal to stop when ordered to do so it was reasonable to detain Respondent for obstruction of a public servant.

The court concluded the officers then lawfully searched A.S.-M.'s backpack because A.S.-M. consented and for officer safety. The court denied A.S.-M.'s motion to suppress.

After a stipulated bench trial, the court found A.S.-M. guilty of juvenile in possession of a firearm. A.S.-M. appeals.

ANALYSIS

A.S.-M. asserts we must reverse his conviction because the court erred in denying his motion to suppress. A.S.-M. argues that both his "initial seizure and subsequent arrest" were unlawful because the officers lacked a reasonable suspicion to stop him and that "all resulting evidence flowing from these detentions must be suppressed." We agree.

4

<u>Warrantless Seizure</u>

A seizure occurs when "considering all the circumstances, an individual's freedom of movement is restrained and the individual would not believe he or she is free to leave or decline a request due to an officer's use of force or display of authority." <u>State v. Rankin</u>, 151 Wn.2d 689, 695, 92 P.3d 202 (2004). The Washington Constitution prohibits warrantless seizures unless they fall within narrowly drawn exceptions. Art. I, § 7; <u>State v. Arreola</u>, 176 Wn.2d 284, 292, 290 P.3d 983 (2012). The State bears the burden of proving that a seizure falls within one of these exceptions. <u>State v. Z.U.E.</u>, 183 Wn.2d 610, 617, 352 P.3d 796 (2015).

The constitutionality of a warrantless stop is a question of law reviewed de novo. <u>State v. Gatewood</u>, 163 Wn.2d 534, 539, 182 P.3d 426 (2008). In reviewing a denial of a motion to suppress, we review the trial court's conclusions of law de novo and the findings of fact used to support those conclusions for substantial evidence. <u>State v. Fuentes</u>, 183 Wn.2d 149, 157, 352 P.3d 152 (2015). "Substantial evidence exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding." <u>State v. Hill</u>, 123 Wn.2d 641, 644, 870 P.2d 313 (1994).

I. Challenged Findings of Fact

A.S.-M. challenges the trial court's finding that both males "began running away <u>when they saw the police officers</u>" and that "Officer Freeman shouted,

5

'Stop, Police,' <u>as he pursued the fleeing subjects</u>."[4]  We agree that substantial

evidence does not support the court's finding.

At the CrR 3.6 hearing, Officer Freeman testified about his initial

encounter with the two males.  He said, in pertinent part:

> When we arrived, we started walking towards the apartment
> complex.  We saw two males look at us, started running, and we
> yelled, "Stop, police," and faced [sic] them because we believed
> they might be involved in the burglary.

But Officer Freeman's testimony conflicted with the police report that he wrote

shortly after the arrest and admitted as evidence at the hearing.  Officer

Freeman's report states, in pertinent part:

> As we were approaching we saw a male look at us and immediately
> begin running away behind one of the buildings in the complex.  A
> second male with the subject looked directly at us and beg[a]n to
> run after I identified myself as a police officer and told him to stop.

When questioned about the discrepancy during cross-examination, Officer

Freeman acknowledged that A.S.-M. started running only after he yelled, " 'Stop,

police.' "

Two other police officers who were at the scene corroborated the events

as described in Officer Freeman's police report.  Officer Baker testified that A.S.-

M. did not run until after his friend ran and after Officer Freeman said, " 'Stop,

police.' "  The trial court admitted Officer Baker's written report as evidence at the

---

[4] A.S.-M. also challenges the finding that 911 dispatched officers at about 10:07 p.m. and that they arrived on scene at 10:11 p.m.  But the trial court admitted Officer Freeman's police report as evidence at the CrR 3.6 hearing and the report confirms this timeline.  Substantial evidence supports this finding of fact.  Additionally, A.S.-M. challenges the court's finding that officers detained and searched A.S.-M. for "officer safety."  The State concedes that substantial evidence does not support this finding.  The testimony established that officers detained A.S.-M. for investigation rather than officer safety, and the officers did not explain their request to search A.S.-M.'s backpack.

hearing and the report confirmed his testimony. Similarly, Officer Walker testified, "Officers Baker and Freeman, I heard verbally contact the male [A.S.-M.] to my right, south where it was. And then when I looked to my right, that male took off running from them." Officer Walker's written police report also confirmed his testimony and the court admitted his report as evidence at the hearing.

Substantial evidence does not support the trial court's finding that both males fled right after seeing the police officers and before the police commanded them to stop. Instead, the evidence establishes that A.S.-M. ran only after Officer Freeman yelled, " 'Stop, police,' " at the males.

II. Reasonable Suspicion

A.S.-M. argues that Officer Freeman lacked reasonable suspicion to seize him at the time Officer Freeman commanded him to stop. We agree.

Generally, warrantless searches and seizures are per se unreasonable under the Fourth Amendment to the United States Constitution and article I, section 7 of our constitution. Arreola, 176 Wn.2d at 291-92. But an officer may briefly detain a person for questioning without a warrant if the officer has reasonable suspicion that the person is or is about to be engaged in criminal activity. Fuentes, 183 Wn.2d at 158; Terry v. Ohio, 392 U.S. 1, 20-21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). A valid Terry stop requires reasonable suspicion of criminal activity based on specific and articulable facts known at the inception of the stop. Fuentes, 183 Wn.2d at 158. A police officer who identifies himself

and commands a person to stop is a show of authority amounting to a seizure. See Rankin, 151 Wn.2d at 695.

In evaluating the reasonableness of a seizure, we look to the totality of circumstances known to the officer when the seizure occurs. Fuentes, 183 Wn.2d at 158. "Factors courts will look to in a totality of the circumstances analysis include, among others, the detaining officer's experience and training, the location of the investigatory detention, and the suspect's conduct." State v. Johnson, 8 Wn. App. 2d 728, 747, 440 P.3d 1032 (2019). "[T]he question is whether the specific facts that led to the stop would lead an objective person to form a reasonable suspicion that [the individual] was engaged in criminal activity." State v. Weyand, 188 Wn.2d 804, 812, 399 P.3d 530 (2017). The facts must be enough to connect the seized person to the "particular" crime under investigation. Johnson, 8 Wn. App. 2d at 746. "The officer must have some suspicion of a particular crime or a particular person, and some connection between the two." State v. Cardenas-Muratalla, 179 Wn. App. 307, 312, 319 P.3d 811 (2014). The suspicion "must be individualized to the person being stopped." Weyand, 188 Wn.2d at 816.

Here, Officer Freeman seized A.S.-M. when he yelled at A.S.-M. to " '[s]top, police.' " Officer Freeman testified that he seized A.S.-M. because A.S.-M. fled the scene. He said that he wanted to speak with A.S.-M.

> [b]ecause he started running away when he saw the police, which based on the circumstances is somebody, you know — [t]he report of a burglary and, when we arrive, a male starts running away from us.

Officer Freeman also testified that he told A.S.-M. to stop because A.S.-M.

matched the description of the burglary suspect, what he described as "[a]n unknown description of a male."

But A.S.-M. did not flee until <u>after</u> Officer Freeman identified himself as police and issued a command to stop. Reasonable suspicion must exist at "the inception" of the stop. <u>Fuentes</u>, 183 Wn.2d at 158. While the evidence established that L.L. fled right after seeing the police, L.L.'s conduct cannot justify seizing A.S.-M. Reasonable suspicion to seize A.S.-M. must be individualized to A.S.-M. <u>Weyand</u>, 188 Wn.2d at 811-12; <u>see</u> <u>Fuentes</u>, 183 Wn.2d at 160-61. And flight alone is not sufficient to justify a seizure; it is only a factor in determining whether reasonable suspicion exists. <u>State v. Howerton</u>, 187 Wn. App. 357, 375, 348 P.3d 781 (2015).

In any event, the indefinite description of the burglary suspect and the circumstances surrounding the stop did not warrant the seizure. Officer Freeman testified that he seized A.S.-M. because A.S.-M. fit the "description" of the burglary suspect and was walking within the same complex as the apartment reporting the burglary. But the description of the burglary suspect consisted only of an "unknown male." The 911 call gave no identifying characteristics of the suspect such as height, weight, race, or clothing. This vague description applies to much of the population. And the officers gave only vague testimony about A.S.-M.'s proximity to the location of the burglary. The officers' testimony placed A.S.-M. between buildings C and D of a large apartment complex. The burglary reportedly occurred in building I, but the record is silent about the distance

9

between the buildings.[5]  See Z.U.E., 183 Wn.2d at 618 ("the facts must connect the particular person to the particular crime that the officer seeks to investigate"); Johnson, 8 Wn. App. 2d at 746 ("the facts available to an officer must connect the seized person to the particular crime that the officer seeks to investigate").

Given the overly general description of the burglary suspect and the vague testimony about A.S.-M.'s proximity to the reported burglary, the totality of the circumstances do not support a reasonable, articulable, individualized suspicion that A.S.-M. committed or was about to commit a crime at the time Officer Freeman seized him.  The State concedes that "if there was no valid basis for telling the appellant to 'stop,' " A.S.-M. "committed no crime by disobeying that unlawful command" and "all evidence derived from the ensuing detention — including the items found in his backpack — would be subject to suppression." We accept the State's concession.  Because reasonable suspicion did not support Officer Freeman's seizure of A.S.-M., "the fruits obtained as a result [of the seizure] must be suppressed."  State v. Doughty, 170 Wn.2d 57, 65, 239 P.3d 573 (2010).

---

[5] The record includes a map of the large apartment complex with none of the buildings labeled.

We reverse the trial court's order denying A.S.-M.'s motion to suppress and vacate A.S.-M.'s conviction.

Brennan, J

WE CONCUR:

Andrus, A.C.J.