# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 82784-7-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| BERNARD GORDON, | |
| Appellant | |

ANDRUS, C.J. — Bernard Gordon appeals his convictions for human trafficking, promoting prostitution, and leading organized crime. Gordon challenges his initial detention, contending the police stopped him without reasonable suspicion that he was committing a crime. He also contends the State presented insufficient evidence to establish that he was the leader of organized crime. Finally, he argues the prosecutor committed misconduct by suggesting that one witness changed her testimony based on Gordon's improper influence. We affirm.

<u>FACTS</u>

On May 29, 2019, the Everett Police conducted an operation in a high prostitution area in Everett, in which Detective Molly Spellman worked undercover as a decoy prostitute. Detective Spellman, with extensive training in undercover work and a thorough understanding of the subculture of prostitution and its

distinctive language, relationships, and context, dressed in a manner typical for prostitutes working in that area and walked slowly and deliberately, making eye contact with drivers. Detective Spellman explained that, "in that environment, the way I was dressed, the actions I was taking by saying I was trying to make money was indicative that I was trying to make money as a prostitute."

Gordon approached Detective Spellman at approximately 11:00 a.m. Calling out to get her attention, Gordon asked what she was doing. Detective Spellman told him she was trying to make money. Gordon asked if she worked for anyone, which Detective Spellman understood to mean whether she had a "pimp" or boss. She told him she was independent. He asked if he could make an "appointment," which Detective Spellman understood to be a request for sex or an inquiry about becoming her pimp. She told Gordon she did not take appointments because she had been stood up in the past. Gordon assured her he would not stand her up but when she refused a second time, Gordon gave her his name, "Terrance," and his phone number.

Detective Spellman reported this conversation to other officers, who surveilled Gordon as he left. They observed Gordon enter a nearby store before getting into a car with two women, later identified as J.S. and B.D. The officers, Detective Gregory Mueller and Officer Anatoliy Kravchun, checked the car registration and learned it was registered to Gordon and that Gordon had prior convictions for promoting prostitution and luring.[1]

---

[1] Under RCW 9A.40.090(1), a person commits the crime of luring when he "[o]rders, lures, or attempts to lure a minor or a person with a developmental disability into any area or structure that is obscured from or inaccessible to the public, or away from any area or structure constituting a bus terminal, airport terminal, or other transportation terminal, or into a motor vehicle" if the perpetrator

Based on Gordon's conversation with Detective Spellman and these prior convictions, Detective Mueller and Officer Kravchun stopped Gordon's car to investigate a possible violation of Everett's Municipal Code (EMC) prohibiting prostitution loitering. EMC 10.24.110.

J.S., who was driving the car when police stopped it, became very nervous and began hyperventilating. The police confirmed her identity and then arrested her on an outstanding Department of Corrections (DOC) warrant and put her into the back seat of the police vehicle. At that point, J.S. told police she worked as a prostitute for Gordon, had been doing so for "quite a while," hated it, and Gordon had abused her. As they drove away, J.S. shouted at Gordon "I [f---ing] hate you. I can't do this anymore. I hate it." The police also learned B.D., the other occupant of the car, had an outstanding DOC warrant and they placed her under arrest as well.

Based on J.S.'s statement, Officer Kravchun arrested Gordon for first degree promoting prostitution. Gordon was released from custody in early August 2019 and rearrested on October 1, 2019. At the time of his second arrest, police learned that Gordon was associated with a stolen vehicle located nearby. They found K.J.-D. sleeping in the front seat of that car. K.J.-D. told police and later testified at trial that she had met Gordon a week earlier, when he solicited her to engage in prostitution. The next day she met up with Gordon while he was with J.S., whom K.J.-D. knew as "Caitlyn." K.J.-D. testified that she spent a week with the couple, sharing meals and sleeping in the car. K.J.-D. explained that Gordon repeatedly

is unknown to the victim and does not have the consent of the victim's parent or guardian. Gordon was convicted of luring in 2009.

sought to "manage" her and her money. While she originally told police she never shared the proceeds from her prostitution with Gordon, she later testified at trial that he let her sleep in his car and "he would basically just hold on to whatever money I made so that I wouldn't spend it on things that I guess didn't need it to be spent on."

At trial, the State called Detective Maurice Washington, an expert on human trafficking, to explain the subculture of prostitution to the jury. He testified that traffickers or "pimps" often patrol areas of prostitution seeking to recruit independent prostitutes to work for them. According to Washington, once the trafficker has a recruit, he establishes a code of conduct dictating how the woman dresses, to whom she can speak, what prices she must charge for her services, and how much money she must earn each day. He stated that traffickers often discipline rule violations with beatings, public humiliation, the withholding of resources, and threats toward the woman's family.

The State presented evidence that Gordon operated consistent with this structure with J.S., B.D., and K.J.-D. K.J.-D. testified Gordon expected her to follow certain rules, including not going on "dates" with Black men, working a particular section of Aurora Avenue, and not talking to anyone on the street that was not a customer. She explained that Gordon communicated with her through text message codes, and reprimanded her for not "following instructions." K.J.-D. also testified Gordon withheld her belongings and controlled the women's money.

The State also introduced Facebook messages in which J.S. confronted Gordon about his violence toward her and asked "[W]hy do you even want me?

There's plenty of other obedient women out there who would gladly take my place."[2] And the State presented evidence that even after his arrest, Gordon gave B.D. directions from jail and told her that the "[o]nly thing you need is the blueprint, these instructions. The instructions don't stop baby."

A jury convicted Gordon of one count of second degree human trafficking, two counts of first degree promoting prostitution, one count of second degree promoting prostitution, and one count of leading organized crime. He was sentenced to 252 months imprisonment. Gordon appeals.

ANALYSIS

Reasonableness of Police Detention

Gordon first contends the police illegally seized him when they stopped his vehicle without a warrant because they lacked reasonable suspicion that he was committing a crime. We disagree.

Under the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington State Constitution, a police officer generally cannot seize a person without a warrant. *State v. Fuentes*, 183 Wn.2d 149, 157-58, 352 P.3d 152 (2015) (citing *State v. Garvin*, 166 Wn.2d 242, 248, 207 P.3d 1266 (2009)).

A *Terry*[3] investigative stop is a recognized exception to the warrant requirement. *State v. Acrey*, 148 Wn.2d 738, 746, 64 P.3d 594 (2003). To conduct a valid *Terry* stop, the investigating officer must have "reasonable suspicion of

---

[2] These messages were sent between "Bishop MegaMac MegaMac" and "Amber Kings" who police determined were Gordon and J.S. based on photographs sent in those Facebook messages. "Bishop" was an alias Gordon commonly used.
[3] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

criminal activity based on specific and articulable facts known to the officer at the inception of the stop." *Fuentes*, 183 Wn.2d at 158. In determining whether the officer had reasonable suspicion, we consider the totality of the circumstances known to the officer at the inception of the stop, including "the officer's training and experience, the location of the stop, the conduct of the person detained, the purpose of the stop, and the amount of physical intrusion on the suspect's liberty." *Id.* (citing *Acrey*, 148 Wn.2d at 746-47.) The showing necessary to meet the reasonable suspicion standard for a *Terry* stop is much lower than the showing necessary to meet the probable cause standard for a search warrant. *State v. Lee*, 147 Wn. App. 912, 921-22, 199 P.3d 445 (2008). Whether a warrantless investigative stop was justified or represents a constitutional violation is a question of law that we review de novo. *State v. Bailey*, 154 Wn. App. 295, 299, 224 P.3d 852 (2010).

Gordon argues that, at the time the police detained him, the police knew only that he had spoken to a female undercover agent in a high-prostitution area, information insufficient to raise a reasonable suspicion of criminal activity. This argument is inconsistent with the record.

Before detaining Gordon, the police knew Gordon was in a location well known for prostitution activity, and that he had approached Detective Spellman, who was walking in a manner intended to look like a prostitute waiting for customers. They also knew he asked Detective Spellman who she worked for and if she would consent to an "appointment" with him. Detective Spellman's experience led her to conclude that Gordon was either soliciting sex or trying to

recruit her to work for him as a prostitute, testimony the trial court found credible. Also before detaining Gordon, police were aware that he had a recent criminal conviction for promoting prostitution and luring. As the trial court found, these specific and articulable facts, in combination, supported a reasonable suspicion that Gordon had violated Everett Municipal Code § 10.24.110, an ordinance criminalizing prostitution loitering.[4]

> That provision states
>
> A person commits the offense of "prostitution loitering" *if he or she remains in a public place and intentionally solicits, induces, entices or procures another to prostitution.* Among the circumstances which may be considered in determining whether a person intentionally solicits, induces, entices or procures another to commit prostitution are:
>
> 1. Repeatedly beckoning to, stopping, or attempting to stop or engage passersby in conversation; or
>
> 2. Repeatedly stopping or attempting to stop motor vehicle operators by hailing, waving of arms or other bodily gestures; or
>
> 3. Being a known prostitute or panderer. "Known prostitute or panderer" means a person who within one year previous of date of arrest for any violation hereof is known by the arresting officer to have been convicted of an offense involving prostitution; or
>
> 4. That the actor inquires whether a potential patron, procurer or prostitute is a police officer or requests the touching of genitals or female breasts or requests exposure of genitals or female breasts with the purpose of establishing that the person is not a police officer.

EMC § 10.24.110(A) (emphasis added).

---

[4] When Officer Kravchun searched Gordon's vehicle registration, he learned that J.S. was associated with the car and that she had an active DOC warrant. Detective Mueller and Officer Kravchun testified that they recognized J.S. as the driver of the vehicle and pulled the car over to arrest her on the outstanding DOC warrant. The trial court, however, rejected this justification for the detention, finding insufficient evidence to establish that the officers had identified J.S. before the stop.

Gordon argues that the police lacked any evidence that he had engaged in any of the actions described in subparagraphs one through four of EMC §10.24.110(A). But under the plain language of the code provision, the elements of the crime are (1) remaining in a public place and (2) intentionally soliciting, inducing, enticing or procuring another to prostitution. The numbered subparagraphs that follow are nonexclusive circumstances that a trier of fact may consider when determining a person's guilt. They are not elements of the crime itself. *See State v. Brown*, 30 Wn. App. 344, 348-49, 633 P.2d 1351 (1981) (interpreting a near identical Seattle ordinance), *overruled on other grounds by State v. Commodore*, 38 Wn. App. 244, 684 P.2d 1364 (1984). Gordon could be guilty of prostitution loitering even if he did not engage in any of the activities described in subparagraphs one through four. Instead, the police only needed reasonable suspicion that he was intentionally soliciting another to prostitution while in a public place. That suspicion is supported by the facts here.

Gordon analogizes his case to *State v. Diluzio*, 162 Wn. App. 585, 254 P.3d 218 (2011) and *State v. Doughty*, 170 Wn.2d 57, 239 P.3d 573 (2010) to suggest that there was an inadequate quantum of facts known to police at the time of the stop. Neither case is analogous.

In *Diluzio*, a police officer saw the defendant stop his car in a high prostitution area and talk through the passenger window to a female pedestrian. 162 Wn. App. at 588-89. The officer also saw the female then get into his car. *Id.* at 589. The officer, who assumed the female was a prostitute from whom Diluzio had solicited sex, conducted a *Terry* stop. Diluzio gave the police officer a false name and was

subsequently arrested on an outstanding warrant. A search incident to his arrest led to the discovery of methamphetamine and heroin. *Id.* at 589.

Diluzio challenged his drug convictions, arguing the officer lacked reasonable suspicion to believe he was committing the crime of solicitation. *Id.* at 591. Division III of this court agreed. *Id.* at 593. The court noted that the officer did not see an exchange of money or overhear any conversation between Diluzio and the female, and neither was known to the police to have been involved in prostitution. It concluded "[t]hese incomplete observations do not provide the basis for a *Terry* stop." *Id.* The court concluded that the totality of circumstances did not support a reasonable suspicion that Diluzio was engaged in soliciting prostitution and reversed his convictions. *Id.* at 588.

In *Doughty*, the police stopped the defendant's car on suspicion of drug activity after observing him park his car at 3:20 a.m., approach a known drug house, return two minutes later, and drive away. 170 Wn.2d at 60. After he was arrested for driving without a valid license, a search incident to arrest led to the discovery of a glass pipe containing methamphetamine. When booked into jail, police found methamphetamine in Doughty's shoe. *Id.* On appeal of a conviction for possession of methamphetamine, Doughty challenged his investigative detention, arguing the police lacked reasonable suspicion to stop him. The Supreme Court agreed and reversed his conviction.

The court noted that a person's presence in a high-crime area late at night does not, by itself, give rise to a reasonable suspicion to detain a person. *Id.* at 62. The police relied on the fact that the house had previously been identified, from

neighbor complaints, as a drug house and the fact that Doughty had visited the house late at night and spent less than two minutes inside. *Id.* But the court noted that the police officer who made the arrest had not observed Doughty's actions inside the house, could not tell if Doughty had interacted with anybody in the house, and had not heard any conversations or observed any suspicious activities other than Doughty's very brief presence in the middle of the night. *Id.* at 64. The court concluded the totality of the circumstances did not justify the stop. *Id.*

Both cases are distinguishable from Gordon's case. In both *Diluzio* and *Doughty*, the police stopped the defendants based on little more than their presence in an area where police suspected criminal activity. Gordon was observed in an area known for prostitution—which is why Detective Spellman was operating undercover in the area. But there was considerably more information known to police when they stopped Gordon than was known by the police in either *Diluzio* or *Doughty*. Unlike the arresting officers in those cases, Detective Spellman had a direct conversation with Gordon, someone police confirmed had prior convictions for promoting prostitution and luring, in which he explicitly solicited her either to engage in sex or to allow him to operate as her pimp. The police based their suspicion on his own words and actions. We conclude the police had a reasonable suspicion based on specific and articulable facts that Gordon had engaged in prostitution loitering and the *Terry* stop was lawful.

## Leading Organized Crime

Gordon next challenges his conviction for leading organized crime under RCW 9A.82.060, arguing that the State failed to present sufficient evidence that

Gordon directed three people to engage in criminal profiteering activity. We disagree with Gordon's interpretation of this criminal statute.

Due process requires that the State prove each element of a charged offense beyond a reasonable doubt. *State v. Chacon*, 192 Wn.2d 545, 549, 431 P.3d 477 (2018). The facts that the State must prove under a criminal statute are a question of law that we review de novo. *State v. Olsen*, 10 Wn. App. 2d 731, 736, 449 P.3d 1089 (2019).

Gordon was convicted of "leading organized crime" under RCW 9A.82.060(1). This statute reads:

(1) A person commits the offense of leading organized crime by:

(a) Intentionally organizing, managing, directing, supervising, or financing any three or more persons with the intent to engage in a pattern of criminal profiteering activity.

"Criminal profiteering activity" is statutorily defined as committing one of several enumerated predicate offenses, including promoting prostitution, for financial gain. RCW 9A.82.010(4)(y). The court instructed the jury in a manner consistent with both RCW 9A.82.060(1) and RCW 9A.82.010(4)(y). Instruction no. 28 read:

To convict the defendant of the crime of Leading Organized Crime as charged in Count 5, each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) that between August 1, 2018, and October 1, 2019, the defendant intentionally organized, managed, directed, or supervised three or more persons;
(2) that the defendant acted with the intent to engage in a pattern of criminal profiteering activity; and
(3) that any of these acts occurred in the State of Washington.

The statute also defines a "pattern of criminal profiteering activity." RCW 9A.82.010(12). The court instructed the jury consistent with this statutory definition. Instruction no. 27 provided:

A pattern of criminal profiteering activity means at least three acts that meet all of the following requirements:

(1) Each act was committed for financial gain;
(2) Each act constituted the crime of promoting prostitution;
(3) The acts had the same or similar intent, results, or methods of commission, or were otherwise interrelated by distinguishing characteristics including a nexus to the same enterprise;
(4) The acts were not isolated events;
(5) At least one of the acts occurred after July 1, 1985; and
(6) The last of the acts occurred within five years after the commission of the earliest act.

Gordon did not object to either of the instructions as an incorrect statement of the elements of this crime.

Gordon now argues for the first time on appeal that RCW 9A.82.060 requires the State to prove that the three people Gordon managed had themselves committed an enumerated predicate criminal profiteering crime. Gordon concedes the State proved he engaged in three acts of promoting prostitution and that promoting prostitution is a predicate criminal profiteering crime but he contends the State did not prove that J.S., B.D., and K.J.-D., engaged in criminal profiteering activities.

We reject Gordon's contention that the statute requires the State to prove that the defendant and those whom he managed all engaged in an act of criminal profiteering, as that argument is inconsistent with the plain language of RCW 9A.82.060.

We review issues of statutory interpretation de novo. *State v. Dennis*, 191 Wn.2d 169, 172, 421 P.3d 944 (2018). The purpose of statutory interpretation is to give effect to the intent of the legislature. *State v. Sweany*, 174 Wn.2d 909, 914, 281 P.3d 305 (2012). To derive legislative intent, we look to the "plain language enacted by the legislature, considering the text of the provision in question, the context of the statute in which the provision is found, related provisions, and the statutory scheme as a whole." *State v. Evans*, 177 Wn.2d 186, 192, 298 P.3d 724 (2013). If the statute's meaning is unambiguous, our inquiry ends. *State v. Armendariz,* 160 Wn.2d 106, 110, 156 P.3d 201 (2007). A statute is ambiguous when it is susceptible to two or more reasonable interpretations, not merely because two different interpretations are possible. *In re Det. of Aston*, 161 Wn. App. 824, 842, 251 P.3d 917 (2011).

First, we cannot find, as an element of this crime, any requirement that Gordon managed others in *their* pattern of criminal profiteering activity. RCW 9A.82.060(1) merely requires the State to prove that Gordon acted "with the intent" to engage in a pattern of such activity; it does not require the State to prove that those whom Gordon managed or directed acted with such an intent. The phrase "with the intent to engage" in subsection (1)(a) unambiguously relates back to the defendant charged with committing the offense, not to the "three or more persons" being managed by the defendant. It would make little sense to require the State to prove the intent of those whom Gordon managed in order to prove Gordon guilty of the crime.

Second, Gordon's interpretation would require us to delete the phrase "with the intent" from the statute completely. We will not delete words from an otherwise unambiguous statute. *State v. Roggenkamp*, 153 Wn.2d 614, 624, 106 P.3d 196 (2005) (quoting *State v. J.P.*, 149 Wn.2d 444, 450, 69 P.3d 318 (2003)).

Third, had the legislature intended for a defendant to be guilty of this crime only when he manages others who engage in an enumerated predicate crime, it could easily have said so. Subsection (1)(b) of the same statute criminalizes "[i]ntentionally inciting or *inducing others* to engage in violence or intimidation with the intent to further or promote the accomplishment of a pattern of criminal profiteering activity." RCW 9A.82.060(1)(b) (emphasis added). The legislature did not, in subsection (1)(a), criminalize intentionally inducing others to engage in criminal profiteering activities.

Finally, Gordon relies heavily on the crime's name, "leading organized crime," to suggest the legislature intended to limit the statute's application to classic organized criminal enterprises made unlawful by the federal Racketeer Influenced and Corrupt Organizations Act (RICO)[5] where a defendant, at the head of a criminal enterprise, directs others to engage in a predicate crime.

It is true that our "pattern of criminal profiteering activity" parallels the federal RICO statute's "pattern of racketeering activity." *State v. Linville*, 191 Wn.2d 513, 521, 423 P.3d 842 (2018) (comparing RCW 9A.82.010(12) with 18 U.S.C. § 1961(5)). But while some of the definitions are similar, the elements of crimes outlined in RICO and RCW 9A.82.060 differ.

---

[5] 18 U.S.C. § 1961 *et seq.*

- 14 -

RICO requires more than proof that a defendant engaged in a pattern of racketeering activity. RICO makes it unlawful (a) to engage in a pattern of racketeering activity and to invest money derived from that activity in the establishment or operation of an enterprise engaged in interstate commerce; (b) to acquire or maintain, through a pattern of racketeering activity, an interest in or control of any enterprise engaged in interstate commerce; and (c) to be employed by or associated with an enterprise engaged in interstate commerce whose affairs are conducted through a pattern of racketeering activity. 18 U.S.C. § 1962(a) - (c).

To establish a RICO crime under 18 U.S.C. § 1962, the federal government must prove either that the defendant derived income from a pattern of racketeering activity and then used or invested some part of that income in the establishment or operation of an enterprise engaged in commerce, *United States v. Vogt*, 910 F.2d 1184 (4th Cir. 1990), or that the defendant associated with an enterprise which conducted its affairs through a pattern of racketeering activities. *United States v. Goldin Indus., Inc.,* 219 F.3d 1271, 1274 (11th Cir. 2000). This RICO enterprise must have some sort of structure, formal or informal, for carrying out its objectives and the various members and associates of the enterprise must function as a continuing unit to achieve a common purpose. *Boyle v. United States*, 556 U.S. 938, 945-46, 129 S. Ct. 2237, 173 L. Ed. 2d 1265 (2009).

The federal RICO crimes actually parallel a different Washington criminal statute, RCW 9A.82.080, under which it is unlawful to use proceeds from criminal profiteering to acquire an interest in or to operate any enterprise, or to acquire an

interest in any enterprise through a pattern of criminal profiteering. RCW 9A.82.060's "leading organized crime" has no federal RICO equivalent.

Only four states, Arizona, North Dakota, New Jersey, and Washington, have enacted similar laws. Susan Brenner, "*RICO, CCE, and Other Complex Crimes: The Transformation of American Criminal Law?*", 2 Wm. & Mary Bill Rts. J. 239, 281-82 (1993). But unlike Washington's leading organized crime statute, Arizona's law requires proof that the defendant intentionally engaged in activities designed or intended to further the illegal objectives of a "criminal syndicate." *State v. Tocco*, 156 Ariz. 110, 750 P.2d 868, 872 (Ar. App. 1986), citing Ariz. Rev. Stat. § 13-2308. A "criminal syndicate" is defined by statute as a combination of persons "engaging, or having the purpose of engaging, on a continuing basis in conduct that violates [a felony] statute of this state." Ariz. Rev. Stat. §13-2301(C)(7).

North Dakota's law makes it unlawful to intentionally organize, manage, direct, supervise, or promote the criminal objectives of a "criminal association," defined as "any combination of persons or enterprises engaging, or having the purpose of engaging, on a continuous basis in conduct which violates any [felony statute] of this state." North Dakota Century Code §§ 12.1-06.1-02; 12.1-06.1-01(1)(b). Washington's statute includes no such criminal association element.

New Jersey's statute more closely follows Washington's statute by explicitly making it unlawful for a person to be a "leader of organized crime." N.J. Stat. Ann. 2C:5-2(g). But that state has statutorily defined "leader of organized crime" to be someone who "purposefully conspires with others as an organizer, supervisor, manager or financier to commit a continuing series of crimes which constitute a

pattern of racketeering activity." *Id.* RCW 9A.86.060 contains no analogous conspiracy requirement.

Thus, although the crime is called "leading organized crime," it defines that crime much differently than either the federal RICO statute or other similar state RICO laws. When a Washington statute defines a term, that definition controls. *State v. Sullivan*, 143 Wn.2d 162, 175, 19 P.3d 1012 (2001). We cannot impose a criminal syndicate, criminal association, or conspiracy element that our legislature chose not to include.

Here, the statutory elements of "leading organized crime" are: the defendant (1) organized, managed, directed, supervised or financed three or more people; and (2) the defendant did so with the intent to engage in a "pattern of criminal profiteering activity."

Gordon suggests that by using the word "pattern," the legislature intended to require proof of a criminal enterprise. But "pattern" is statutorily defined as "engaging in at least three acts of criminal profiteering" within a five-year period. It does not require proof that more than one person engaged in such acts.

Indeed, the statute further explains that "the three acts must have the same or similar intent, results, accomplices, principals, victims, *or* methods of commission, *or* be otherwise interrelated by distinguishing characteristics including a nexus to the same enterprise, and must not be isolated events." RCW 9A.82.010(12) (emphasis added). Certainly, had Gordon recruited his three victims to act as accomplices in the commission of three predicate crimes, that activity would fall within the definition of a "pattern."

- 17 -

But the legislature defined "pattern" more broadly, using the disjunctive, requiring neither principals nor accomplices to the predicate crimes. When the legislature uses the term "or," as they did in the definition of "pattern," we presume it is being used in the disjunctive sense unless the legislative intent is clearly to the contrary. *Childers v. Childers*, 89 Wn.2d 592, 595-96, 575 P.2d 201 (1978). Use of the disjunctive in a statute indicates alternatives. *See generally*, A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, Conjunctive/Disjunctive Canon, 116 (2012). Based on this reading, the State may establish a pattern by showing that the defendant directed accomplices to commit criminal profiteering activities or, alternatively, by showing that the defendant committed the predicate crimes himself but managed or directed three people to further his own ability to profit from this criminal conduct.

Under this reading of RCW 9A.82.060, the evidence was sufficient to prove that Gordon led organized crime by directing, managing, or supervising the prostitution activities of three women, J.S., B.D., and K.J.-D., for his personal financial gain. He dictated how the women dressed, with whom they interacted, and how much they charged customers for sex. Gordon acted with the intent to promote the prostitution activities of all three women—an enumerated criminal profiteering act.[6] We therefore affirm Gordon's leading organized crime conviction.

---

[6] Gordon also argues that the State failed to prove that he led J.S., B.D., and K.J.-D. at the same time. We reject this argument as well because the statute does not require proof that a defendant directed or managed three people simultaneously. The only temporal requirement is that the defendant's three criminal profiteering activities must occur within a five-year period.

Prosecutorial Misconduct

Finally, Gordon contends that the prosecutor committed misconduct in questioning B.D. about why she changed her story about Gordon's involvement in her sex work and suggesting in closing that Gordon had improperly influenced her testimony.

A prosecutor must ensure that they do not violate a defendant's right to a constitutionally fair trial. *State v. Monday*, 171 Wn.2d 667, 676, 257 P.3d 551 (2011). To establish prosecutorial misconduct, a defendant must show that the prosecuting attorney's questions or statements were both improper and prejudicial. *State v. Allen*, 182 Wn.2d 364, 373, 341 P.3d 268 (2015). We consider the prosecutor's conduct in the context of the record and all the circumstances at trial. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011).

B.D. initially denied engaging in prostitution and denied that Gordon managed her prostitution activities. She later informed the State that Gordon had trafficked her. B.D. described in great detail how Gordon had repeatedly abused her, took her money, and imposed rules as to where she could walk and to whom she could speak.

But immediately before the State called B.D. to testify at trial, the prosecutor informed the court that B.D. was being held in the jail and "is extraordinarily fearful being labeled [a] snitch. She's been hearing things through the [jail] vent. They've been—inmates have been yelling at her through the vent about this." The prosecutor explained that there was an inmate at the jail "[w]ho talked to her about why he knew she was here. So she's labeled a snitch in the jail right now. And

she's got to go back to prison where she [will have the] label [of] a snitch."  The prosecutor indicated he was unsure how B.D. would testify and explained that, if she changed her testimony, he wanted "to explore to some degree what's motivating that."

When the State called B.D. to the stand, she denied that Gordon had promoted her prostitution activities.  The prosecutor then impeached B.D. with her prior inconsistent statements.  In the course of this examination, B.D. stated that, while not afraid of Gordon, she did not want to testify against him.  The State elicited testimony that B.D. was in prison and B.D. confirmed she was raised in an environment that strongly discouraged talking to the police.  After B.D. admitted she had told the prosecutor "things [she] knew would probably get [Gordon] in trouble," the prosecutor asked to address the issue of B.D.'s testimony outside the presence of the jury.  With the jury absent, the prosecutor informed the court that he wanted to introduce evidence that B.D. had been threatened in jail and that these threats may have contributed to her changing tale.

The court recognized that there was no evidence that Gordon had directed threats at or otherwise communicating with B.D. at the jail.  The court nonetheless allowed the prosecutor to ask a very limited, leading question regarding what B.D. had heard while in jail.  The court specifically ruled that the prosecutor could not suggest that Gordon was in the same jail as B.D.

In accordance with the trial court's ruling, the prosecutor asked B.D. "You told me that while you've been in jail here, people were reaching out to you in the vents, talking about you testifying in this case, correct?"  B.D. answered "Not

necessarily." The prosecutor then moved on to a different topic and pursued this line of questioning no further.

In closing argument, the prosecutor asked the jury to assess the credibility of the witnesses and argued

> it was quite obvious why [B.D.] testified the way she did. She's been taught since an early age that you don't snitch, no matter the harm, no matter the abuse, you don't snitch. You don't point your finger at someone, you don't talk to the police, you don't talk to somebody like me, even though she did that last week. She did it again when she met with [defense counsel] and his defense team.
>
> But we don't know what it's like. She has to go back into the jail here where she might not necessarily or might be hearing things in the vents. And then she has to go back down to Purdy and be in prison, labeled a snitch.

The prosecutor implied that B.D. changed her testimony because "[t]his defendant still has the control over her."

Gordon argues that the prosecutor improperly suggested that Gordon tampered with and controlled B.D.'s testimony. Gordon further contends that the prosecutor vouched for her story when he suggested that Gordon had improperly influenced her testimony.

We conclude that neither the prosecutor's questions of B.D. nor the comments in closing constitute misconduct. The prosecutor questioned B.D. after a thorough debate outside the presence of the jury and asked only the question the trial court permitted him to ask. The record does not support the contention that the prosecutor's question about the jail vents suggested either that Gordon was in custody or that he was the one attempting to influence B.D.'s testimony. The

question, taken in the context of B.D.'s testimony, merely implied that she was afraid other inmates might consider her a snitch.

The prosecutor's closing argument flowed from B.D.'s testimony. A prosecutor has "wide latitude in drawing and expressing reasonable inferences from the evidence, including inferences about credibility." *State v. Thompson*, 169 Wn. App. 436, 496, 290 P.3d 996 (2012). The prosecutor here accurately recounted how B.D.'s testimony had changed over time and made a permissible inference that she changed her testimony because she was afraid of being labeled a snitch.

Contrary to Gordon's arguments, the prosecutor's comments do not amount to impermissible vouching because they did not put the government's credibility behind her story or imply that additional information supported her testimony. *See State v. Robinson*, 189 Wn. App. 877, 892-93, 359 P.3d 874 (2015) (vouching occurs where the prosecution places the prestige of the government behind the witness or indicates that information not presented to the jury supports the witness's testimony). To the contrary, the prosecutor attacked B.D.'s credibility. He highlighted the inconsistencies in her various versions of events and challenged the jury to consider her motivations for seeking to exculpate Gordon. Gordon cites no authority supporting his contention that permissible impeachment of a witness amounts to impermissible vouching.

To the extent that the prosecutor erroneously implied that Gordon had tampered with B.D.'s testimony, Gordon did not object and has not demonstrated

that the comment was so flagrant or ill-intentioned that it could not have been cured by an instruction.

We determine whether the defendant was prejudiced by prosecutorial misconduct under one of two standards of review. *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). If the defendant made a timely objection at trial, he must demonstrate that any improper conduct "resulted in prejudice that had a substantial likelihood of affecting the jury's verdict." *Allen*, 182 Wn.2d at 375. But when a defendant fails to object at trial, "the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Emery*, 174 Wn.2d at 760-61. In order to prevail under this heightened standard, the defendant must show that (1) no curative instruction could have eliminated the prejudicial effect, and (2) there was a substantial likelihood the misconduct resulted in prejudice that affected the verdict. *Id.* at 761. Gordon has made neither showing here.

We therefore affirm.

Andrus, C.J.

WE CONCUR:

Coburn, J.          Mann, J.