# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59854-0-II |
| Respondent, | |
| v. | |
| KENNETH LEE BUTLER, | UNPUBLISHED OPINION |
| Appellant, | |
| CINDY RAE CONNER, | |
| Defendant. | |

GLASGOW, J.— Cindy Conner and Kenneth Butler parked in the rear of a truck stop parking lot. Officer Nichols had seen their car earlier in the evening at the same gas station while on patrol and, after seeing it again, he parked his patrol car a short distance away and approached the car on foot. As Nichols walked up to the car, he noticed what he thought to be an improper trip permit. As he got close enough to talk to Conner, who had stepped out of the driver's side, Nichols smelled burnt fentanyl coming from the inside of the car. Nichols asked for Conner's driver's license and discovered it was suspended. Nichols continued to ask about the smell of fentanyl and, after a few moments, Conner pointed to Butler and silently mouthed to Nichols that the drugs belonged to Butler.

Relying on the smell and Conner's gestures, Nichols asked another officer to detain Butler by removing him from the vehicle, placing him in handcuffs, and seating him on the hood of the

Conner's car. Nichols gave Butler *Miranda*[1] warnings and, after questioning Butler, he showed officers where to find fentanyl on the passenger side of the car where he had been sitting. After the officers searched the car with Conner's consent, the officers gave Butler *Miranda* warnings again while he was still handcuffed in the back of a police car. Butler then admitted he was planning to sell the fentanyl.

The State charged Butler with unlawful possession of a controlled substance with intent to deliver. Butler moved to suppress his statements and the evidence obtained from the car as a fruit of an unlawful seizure, arguing he was unlawfully detained. The trial court concluded that Nichols had conducted an investigative *Terry* stop[2] and properly detained Butler based on the officer's reasonable articulable suspicion that Conner and Butler were involved in a crime.[3] The trial court denied Butler's motion.

Butler appeals the denial of his suppression motion. Butler argues that the officers lacked a sufficient basis to seize Butler, and the proper remedy was exclusion of Butler's subsequent statements to the officers, as well as other evidence arising from the seizure. We hold that Butler was lawfully detained and was given *Miranda* warnings before he directed officers to the fentanyl on the passenger side of the car. After the officers found fentanyl on the passenger side of the car, Butler's ongoing detention was proper, and he received *Miranda* warnings again before he

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] *Terry v. Ohio,* 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[3] At the time of Butler's offense, the statute had been amended to include the element of "knowingly" in the crime of unlawful possession of a controlled substance. *See* LAWS OF 2023, ch. 1, § 2.; *see also State v. Blake,* 197 Wn.2d 170, 481 P.3d 521 (2021).

admitted to intending to sell the fentanyl pills. Thus, the trial court properly admitted the evidence of the fentanyl Butler led officers to, as well as his incriminating statements. We affirm.

FACTS

I. BACKGROUND

Officer Nichols was conducting a routine patrol of a truck stop in Napavine, Washington. Nichols had been to the same truck stop earlier in the night. After seeing the same car a second time, Nichols decided to talk to the driver and passenger.

Nichols saw the car drive away from the gas pumps and park in a lot. Nichols parked his car about 50 feet away. He did not activate his emergency lights. As Nichols approached the vehicle on foot, he saw Conner exit the vehicle on the driver's side. Butler was sitting in the passenger seat. Nichols did not attempt to stop Conner or Butler from leaving as he approached them and neither tried to leave. Nichols testified that in his experience, in similar situations, when he approached a person by walking toward them, they often walked away from him.

When Nichols arrived at the car, he began talking to Conner about the car and asked about the temporary trip permit on the car's back window, which Nichols thought might have been altered.[4] As Nichols and Conner spoke, Nichols came closer to the car to examine the permit, which was in the rear window.

Nichols was roughly two feet away from the open driver's side door when he smelled what he believed to be burnt or recently smoked fentanyl, which has a distinctive smell like burnt popcorn. Nichols believed the smell to be coming from the car, not from the surrounding area.

---

[4] Under RCW 46.16A.320, a car with expired tabs can be operated legally with a temporary trip permit. The permit itself is a piece of paper that must be displayed prominently from the vehicle. The permit is valid for three consecutive days and must not be altered.

3

Nichols confronted Conner and Butler, who was sitting in the front passenger seat, about his suspicions that they had been smoking fentanyl. Nichols also asked Conner for her driver's license and began the process of checking her license through dispatch. Conner and Butler both denied Nichols' assertions, but as Nichols kept talking to Butler through the open driver's side door, Conner began gesturing by pointing at Butler from behind her hand and mouthing "he has it." 1 Verbatim Rep. of Proc. (VRP) (June 5, 2024) at 23.

In the meantime, dispatch responded and Nichols learned that Conner's driver's license was suspended. Officer Dave Sims arrived on the scene, and Nichols told Sims to detain Butler while Nichols placed Conner under arrest for driving with a suspended license.

Sims approached the passenger side of the vehicle, removed Butler from the car, placed him handcuffs, and sat him on the hood of Conner's vehicle. After Nichols placed Conner in the back of his police car, he returned to Sims and Butler where he read Butler his *Miranda* warnings.

Nichols then confronted Butler again with his conclusion that the burnt fentanyl smell was coming from the car and his suspicion that someone had smoked fentanyl in the vehicle. Nichols demanded to know where the fentanyl was. After a long pause, Butler acknowledged his rights and showed officers to the passenger side of the vehicle where he informed Nichols that there were fentanyl pills in a "puck"[5] near the passenger seat. 1 VRP (June 5, 2024) at 25. The officers looked through the passenger side window where Butler pointed, but they did not open the car at that time.

Nichols then performed a search of Conner's purse, incident to her arrest, and found eight baggies, each containing roughly 100 blue pills. Nichols also gave Conner *Miranda* warnings.

---

[5] A "puck" here refers to a small, rubber container.

After telling Conner what he found in her purse, Nichols asked Conner about the pills. She responded that Butler was the one selling the drugs and that he put the pills in her purse.

Nichols told Conner that Butler had admitted there were additional fentanyl pills in the car, and Nichols asked if he could search the car and Conner consented. Nichols then got Conner out of his police car so that she could watch the search, and he told her she could stop the search at any time. Conner again told Nichols he could search the car.

Looking inside the car through the open passenger door, Nichols remarked that he could smell burnt fentanyl, but Sims did not smell anything. Nichols pointed out a blue pill with markings consistent with fentanyl tablets sitting on the passenger seat. Underneath the passenger seat, Nichols found the puck Butler had directed him to that contained fentanyl pills. The officers did not find any other relevant evidence in the car.

Nichols then went back to Butler, who was still handcuffed, now in the back of Sims' patrol car. Nichols readvised Butler of his *Miranda* rights before asking Butler about Conner's statement that the fentanyl pills were his. Butler admitted to selling the pills, which he confirmed were fentanyl. Butler said he planned to sell the pills in Marysville for $2.00 per pill. He confirmed that a bag of 100 pills cost $200. Nichols then told Butler that he was under arrest. The State tested the pills and confirmed they contained fentanyl.

The State charged Butler with unlawful possession of a controlled substance with intent to deliver.

## II. MOTION TO SUPPRESS

Butler moved to suppress under CrR 3.6 all evidence and any fruit of the encounter with Nichols, including Butler's incriminating statements, as the products of an unlawful seizure. Butler

5

argued that Nichols did not articulate a sufficient reason for approaching the car, that the trip permit was not improperly altered so it did not support Nichols initiating any investigation, and Nichols' contact with Conner and Butler was based on pretext. The State responded that Nichols approached Conner and Butler as a social contact and developed reasonable suspicion to detain them and investigate when he suspected an altered trip permit and smelled burnt fentanyl coming from the car.

At the suppression hearing, Officer Nichols testified about the events as described above. The trial court admitted Nichols' body-worn camera footage into evidence and reviewed clips of it during Nichols' direct examination. Butler also briefly testified at the suppression hearing. He said that Nichols appeared to watch him and Conner for a while before approaching them, that Nichols parked 20 feet away from them rather than 50 feet, and that Nichols was aggressive from the beginning of his interaction with them.

After the testimony, Butler's counsel made several arguments: Nichols approached intending to investigate, rather than engage in a social contact; the trip permit was valid and reliance on its alteration was pretextual; and Nichols did not have a valid basis for checking Conner's identification or detaining Conner and Butler for investigation. At no point did defense counsel argue that Butler was placed under arrest without probable cause, arguing instead that the initial contact and investigation were invalid.

The trial court stated during the hearing that it found the trip permit was not altered. The State responded that even absent a trip permit violation, Nichols smelled burnt fentanyl coming from the car before he asked for Conner's license or conducted any further investigation. Thus, the smell was an independent basis for briefly detaining Conner and Butler to further investigate.

The trial court ruled, "I am going to deny the motion to suppress. I find that this was a social contact when it was initiated." 1 VRP (June 5, 2024) at 90. The court also concluded,

> [W]hat we saw on the video, that corroborates Officer Nichols['] testimony regarding the fact that he smelled that, almost immediately as he walked up to the open door on the vehicle.
> So he had that, so he had a reasonable suspicion that there was criminal activity going on, that that was a basis for him to ask for the ID. It was a basis for him ultimately to get the – – with the arrest and the purse and to ask the other questions of Mr. Butler. So all of those things, for those reasons I am denying the motions to suppress.

1 VRP (June 5, 2024) at 91. The trial court did not enter written findings and conclusions on the CrR 3.6 suppression hearing.

### III. TRIAL ON STIPULATED FACTS AND SENTENCING

After the trial court denied Butler's motion to suppress, Butler and the State agreed to a series of stipulated facts, enumerating the evidence as described above, and Butler agreed to proceed to a bench trial on the stipulated facts. The trial court entered written findings and conclusions containing the stipulated facts, which also included the facts the court found in its oral ruling at the CrR 3.6 suppression hearing. Relevant to the arguments on appeal, the stipulated findings stated that Nichols' initial contact with Conner and Butler was a social contact. The stipulated facts also recited that after *Miranda* warnings, Butler showed the officers where fentanyl was hidden in the car, and he admitted to his plans to sell the fentanyl pills.

The trial court found Butler guilty as charged. Butler was sentenced to 24 months under a drug offender sentencing alternative program.

Butler appeals.

7

ANALYSIS

Butler argues that the trial court erred when it denied his motion to suppress the evidence found as a result of his detention and arrest. Butler contends that Nichols placed him under arrest without probable cause when Butler was removed from the vehicle, placed in handcuffs, and detained on the hood of the car. He asserts that any evidence or statements obtained as a result of that arrest must be suppressed.

Under the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington State Constitution, law enforcement generally may not seize a person without a warrant. *State v. Grande,* 164 Wn.2d 135, 141, 187 P.3d 248 (2008). The State bears the burden of showing that the seizure falls within one of the exceptions to the warrant requirement. *State v. Z.U.E.*, 183 Wn.2d 610, 617, 352 P.3d 796 (2015).

Further, the Fifth Amendment to the United States Constitution and article I, section 9 of the Washington State Constitution provide a privilege against self-incrimination. *State v. Radcliffe,* 164 Wn.2d 900, 905, 194 P.3d 250 (2008). To avoid unknowing or involuntary waiver of a suspect's Fifth Amendment rights, prior to custodial interrogation, a person must be informed of the right to remain silent and the right to counsel through *Miranda* warnings. *State v. Trochez-Jimenez,* 180 Wn.2d 445, 447, 325 P.3d 175 (2014).

I. *TERRY* STOP AND REASONABLE SUSPICION

One exception to the Fourth Amendment and article I, section 7's warrant requirement, a *Terry* stop, permits an officer to briefly detain a person for questioning without a warrant based on the officer's "reasonable suspicion of criminal activity." *State v. Fuentes*, 183 Wn.2d 149, 158,

352 P.3d 152 (2015). In a challenge to a *Terry* stop, we review the trial court's findings of fact for substantial evidence and the trial court's conclusions of law de novo. *Fuentes*, 183 Wn.2d at 157.

A.       Lack of Written Findings and Conclusions

As an initial matter, the trial court did not enter written findings and conclusions to support its suppression ruling. But in reviewing the denial of a motion to suppress without written findings and conclusions, we can look to the court's oral ruling so long as it is supported by substantial evidence in the record and is detailed enough to allow for appellate review. *State* v. *McGee*, 26 Wn. App. 2d 849, 864 n.7, 530 P.3d 211 (2023).

Here, the trial court gave detailed findings and reasoning in its oral ruling, and it recited those findings in its later written findings and conclusions entered after the bench trial. Moreover, the evidence in the record contains the body-worn camera recording of Nichols' interactions with Conner and Butler, as well as Nichols' and Butler's testimony. Thus, we are able to evaluate whether the trial court erred when it declined to suppress the evidence Butler showed the officers in the car and Butler's incriminating statements.

B.       The Social Contact Finding

Butler challenges only one finding of fact on appeal. Butler argues the trial court erred when it found that the initial contact between Nichols and Butler began as a social contact. We review findings of fact for substantial evidence. *Fuentes*, 183 Wn.2d at 157. Evidence is substantial if it is sufficient to persuade a fair-minded, rational person of its truth. *State v. Garvin,* 166 Wn.2d 242, 249, 207 P.3d 1266 (2009).

Here, the trial court's finding is supported by Nichols' testimony that he had seen the car earlier in the night at the truck stop and he frequently engaged people in social contacts there.

Nichols also testified that as he walked up to the car, he made no attempt to stop Conner or Butler from leaving, and that they made no attempt to leave as he approached. Nichols testified that in his experience engaging people in social contacts, if they did not want to speak with him, they would leave. Nichols' testimony also shows that he did not develop a suspicion of criminal activity until he was close enough to Conner and the car to see the trip permit and smell the burnt fentanyl smell coming from the open car door. This evidence is sufficient for a rational person to find the contact began as a social contact. Thus, Nichols' testimony is substantial evidence sufficient to support the trial court's finding that the initial contact between Nichols and Butler began as a social contact.

C. *Terry* Stop and Brief Investigation

    1. Reasonable suspicion specific to Butler

In addition to his challenge to the specific social contact finding, Butler argued below that Nichols did not develop reasonable suspicion sufficient to conduct an investigative stop. On appeal, Butler also argues, in part, that there was no particularized suspicion of Butler that warranted detaining him. We conclude that under the totality of the circumstances, including the smell of recently burned fentanyl and Conner's gestures implicating Butler, Nichols had reasonable suspicion to briefly detain Butler to investigate under *Terry*.

Whether a warrantless investigative stop was justified or considered a constitutional violation is a question of law that we review de novo. *State v. Tysyachuk*, 13 Wn. App. 2d 35, 44, 461 P.3d 403 (2020). To justify a *Terry* stop, the State must establish that the officer had a reasonable articulable suspicion of criminal activity. *Fuentes*, 183 Wn.2d at 158. The officer's suspicion must be "based on specific and articulable facts known to the officer at the inception of

the stop." *Id*. Reasonable articulable suspicion is evaluated based on the totality of circumstances known to the officer, including "the officer's training and experience, the location of the stop, the conduct of the person detained, the purpose of the stop, and the amount of physical intrusion on the suspect's liberty." *Id.* Additionally, under the Washington State Constitution, "the facts must connect the particular person to the *particular crime* that the officer seeks to investigate." *Z.U.E.*, 183 Wn.2d at 618.

The Washington Supreme Court has held that the smell of illegal drugs coming from a vehicle can support probable cause to search the vehicle. *Grande*, 164 Wn.2d at 146. However, the Washington Supreme Court was clear in *Grande* that where there is more than one person in the car, the smell of a controlled substance emanating from a vehicle, on its own, is insufficient to associate criminal activity with a particular individual in the car or to arrest a passenger for whom there is no individualized suspicion. *Id.* The *Grande* court explained,

> This does not mean, however, that a law enforcement officer must simply walk
> away from a vehicle from which the odor of marijuana emanates and in which more
> than one occupant is present . . . because the officer had training and experience to
> identify the odor of marijuana and smelled this odor emanating from the vehicle,
> he had probable cause to search the vehicle.

*Id.*[6] Thus, the *Grande* court made it clear that when the odor of a controlled substance emanates from a car, an officer may continue to investigate its source, even if there is not yet particularized suspicion of a specific occupant. The *Grande* court also confirmed that gestures and other passengers' conduct are relevant factors in determining whether further investigation is warranted. *Id.* at 144.

---

[6] *Grande* was decided before recreational marijuana was legalized in Washington.

Here, considering the totality of the circumstances, Nichols had reasonable articulable suspicion—a suspected altered trip permit and the need to approach the car to get a closer look at the trip permit. Nichols testified that he smelled the fentanyl as soon as he came close to the car and that he immediately confronted Conner and Butler about it. This is confirmed in the body-worn camera video. Nichols' additional testimony about his training and experience as to what burnt fentanyl smells like, and Conner's gestures towards Butler and her mouthing "'he has it,'" were enough additional information to create an individual, particularized suspicion of Butler. 1 VRP (June 5, 2024) at 22.

Under *Grande*, we agree with the trial court that Officer Nichols had reasonable, individualized suspicion that Butler was engaged in criminal activity at the time he was removed from the car, and this was sufficient to warrant further investigation. Thus, the officers did not violate Butler's Fourth Amendment or article I, section 7 rights when they detained him.

2.  Handcuffs did not transform the *Terry* stop into a formal arrest

Butler also argues that Officers Nichols and Sims subjected him to a custodial arrest without probable cause. Butler asserts he was subject to formal arrest when the officers removed him from the car, placed him in handcuffs, and read him his *Miranda* rights. From this, Butler concludes that because his incriminating statements were made after this improper arrest, his statements and evidence from the car should have been suppressed. The State concedes that Butler was in custody when he was removed from the vehicle and placed in handcuffs, but it argues that

this custodial detention was lawful and Butler received *Miranda* warnings before he made incriminating statements.[7]

Handcuffs did not elevate the interaction to formal arrest as Butler contends. Generally, an investigatory stop consists of brief detainment, questioning, and frisking for weapons, but under certain circumstances, officers may briefly use additional measures like handcuffing and seclusion to investigate further. *State v. Mitchell*, 80 Wn. App. 143, 145-46, 906 P.2d 1013 (1995). Officers are permitted to take such measures when they are reasonably necessary to protect the officers' personal safety. *State v. Escalante*, 195 Wn.2d 526, 537, 461 P.3d 1183 (2020). Such measures may render a stop custodial for purposes of *Miranda,* while remaining an investigative stop under *Terry*. *Id.* (recognizing a stop may remain a *Terry* stop but still be custodial for purposes of requiring *Miranda* warnings); *State v. Bray*, 143 Wn. App. 148, 154, 177 P.3d 154 (2008) (finding handcuffs and a 30-minute detention were reasonably related in scope to the stop under *Terry* where Bray did not dispel officers' suspicions that he was involved in a burglary). Thus, placing Butler in handcuffs for a brief time did not automatically render him under formal arrest.

An officer places someone under arrest when the officer manifests an intent to take the person into custody and actually seizes the person. *State v. Salinas*, 169 Wn. App. 210, 217-18, 279 P.3d 917 (2012). To determine whether an investigative *Terry* stop has evolved into a formal

---

[7] We note that this argument is different from the arguments Butler raised below to support suppression. Below, Butler argued that Nichols did not articulate a sufficient reason for approaching the car; that the trip permit was not improperly altered, so it did not support Nichols initiating any investigation including checking Conner's identification; and Nichols' contact with Conner and Butler was based on pretext. Butler did not argue below that Officers Nichols and Sims lacked probable cause to arrest him and any evidence gathered or statements he made during the unlawful arrest must be suppressed. But the State does not contend that Butler waived any arguments under RAP 2.5 by not making them below. *See generally* Br. of Respondent. Thus, we address the substance of Butler's arguments.

arrest, Washington courts assess the purpose of the stop, the amount of physical intrusion on the person's liberty, and the amount of time they were detained. *State v. Wheeler*, 108 Wn.2d 230, 235, 737 P.2d 1005 (1987). Importantly, a *Terry* stop may be reasonably extended if the officers' suspicions are confirmed or if they discover new information in their initial investigation. *State v. Mecham*, 186 Wn.2d 128, 137-38, 380 P.3d 414 (2016). And the Washington Supreme Court has held that placing a suspect in handcuffs in the back of a police car and briefly transporting them to a different location for a witness identification was within the scope of a *Terry* stop, rather than a formal arrest. *Wheeler*, 108 Wn.2d at 235. Here, Butler's detention falls within the scope of a *Terry* stop. Handcuffing Butler, removing him from the car, and detaining him briefly was necessary for Nichols to question Butler and further investigate the possible presence of fentanyl in the car, especially when Nichols had smelled burnt fentanyl emanating from the car and Conners had gestured and mouthed that the drugs were Butler's. Nichols initiated Butler's detention to investigate the smell of burnt fentanyl; Butler's detention on the hood of and near the car was associated with the brief investigation, and Butler did not dispel Nichols suspicions. Thus, Butler's detention for further investigation was reasonable.

Moreover, the intrusion on Butler's physical liberty was minimal. Butler was detained for about six minutes before making statements about the location of fentanyl in the car. Under the totality of the circumstances, the initial detention was within the scope of a *Terry* stop and did not amount to a custodial arrest. *State v. Alexander*, 5 Wn. App. 2d 154, 163-64, 425 P.3d 920 (2018) (approving a detention for nine minutes for investigation before probable cause led to the defendant's arrest).

3.        Admissibility of Butler's initial statement about where the fentanyl was

Butler asserts that any statements he made while being held in handcuffs during questioning or the investigation of the car should be excluded, even though he received *Miranda* warnings. Butler appears to conflate to some extent the Fourth Amendment's and article I, section 7's protections against improper seizure with the Fifth Amendment's and article I, section 9's protection against self-incrimination. When a person's detention becomes custodial, *Miranda* warnings are required to avoid suppression of incriminating statements. *State v. Rosas-Miranda*, 176 Wn. App. 773, 779, 309 P.3d 728 (2013). Properly recited *Miranda* warnings ensure the voluntary nature of subsequent incriminating statements made during a custodial interrogation, absent additional issues like the later invocation of the right to silence or counsel, which did not occur here. *State v. Mayer*, 184 Wn.2d 548, 557, 362 P.3d 745 (2015).

To the extent Butler argues that the statements he made while handcuffed and detained were inadmissible, we disagree. Butler's detention became custodial when he was removed from the car and handcuffed. But Nichols gave Butler *Miranda* warnings as soon as the officers detained Butler and before Nichols asked Butler about fentanyl in the car. Butler acknowledged the *Miranda* warnings and led the officers to the passenger side of the car where he said that there was fentanyl in a puck on the floor near the passenger seat.

Because Butler's detention was valid for the reasons explained above, and because Nichols gave Butler *Miranda* warnings before Butler showed them where the fentanyl was located in the car, the trial court did not err when it denied the motion to suppress Butler's statements.

## II. BUTLER'S ADMISSIONS AFTER THE SEARCH OF THE CAR

Butler also contends that statements he made after the search of the car were improperly admitted. After Butler showed the officers, from outside the car, where the fentanyl was hidden near the passenger seat, Nichols got consent from Conner to search the car. When the officers searched the car, they found a fentanyl pill on the passenger seat and the puck containing fentanyl where Butler said it would be.

Nichols then went back to Butler, who was still handcuffed and now in the back of Sims' patrol car. Nichols readvised Butler of his *Miranda* rights before asking Butler about whether the fentanyl pills were his. Butler admitted to selling the pills, which he confirmed were fentanyl. Butler said he planned to sell the pills in Marysville for $2.00 each. Nichols then told Butler that he was under arrest.

Even if we assume that placing Butler, still handcuffed, in the back of the police car elevated his detention to formal arrest, Nichols had probable cause at that point to arrest Butler. "Probable cause for a warrantless arrest exists when facts and circumstances within the arresting officer's knowledge are sufficient to cause a person of reasonable caution to believe that a crime has been committed." *State v. Huff,* 64 Wn. App. 641, 646, 826 P.2d 698 (1992). In *Huff,* there was sufficient probable cause to arrest Huff where the officer smelled methamphetamine, Huff's passenger made furtive gestures as the car was being pulled over and lied to the officer about her identity. *Huff,* 64 Wn. App. at 648. Here, the evidence was at least as substantial as the evidence that supported the arrest in *Huff.* Butler's prior statements, and the fentanyl and puck found under the passenger side of the car where Butler had been seated were enough for a person of reasonable caution to believe Butler possessed fentanyl with intent to deliver. *Id.*

16

Moreover, Butler seems to conflate remedies for his alleged improper arrest with remedies for violation of the right against self-incrimination. Whether or not Butler was under formal arrest, Butler had twice been given *Miranda* warnings before he answered Nichols' final series of questions. Butler does not argue that admitting those incriminating statements violated the Fifth Amendment or article I, section 9. And Butler fails to establish that his continued detention and arrest after the search of the car violated the Fourth Amendment and article I, section 7.

## CONCLUSION

In sum, Butler fails to show that the trial court erred when it declined to suppress Butler's incriminating statements and the other evidence obtained during Nichols' investigation. We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
GLASGOW, J.

We concur:

_____
LEE, J.

_____
VELJACIC, A.C.J.